[S. F. No. 20451. In Bank. Oct. 27, 1960.]

CRESTVIEW CEMETERY ASSOCIATION (a Nonprofit Corporation), Plaintiff and Appellant, v. LEONARD DIEDEN, Respondent; CHAUNCEY McKEEVER, Cross-Defendant and Appellant.

Livingston & Borregard, Lawrence Livingston and Paul C. Maier for Appellants.

Robert C. Burnstein and Fred F. Cooper for Respondent.

PETERS, J.—The sole question presented on this appeal is whether the trial court correctly interpreted the contract admittedly existing between the parties. We are of the opinion that, under the facts here existing, the question of interpretation was primarily one of fact, and that all of the findings of the trial court on this issue are amply supported by the evidence. For that reason, we are of the opinion that the judgment should be affirmed.

The parties here involved are the plaintiff and one of the appellants, the Crestview Cemetery Association, a nonprofit corporation that owned some land in Alameda County that it desired to develop as a cemetery; the cross-defendant and appellant Chauncey McKeever, an attorney at law and an officer of Crestview, who, in negotiating the contract here in dispute, admittedly acted for Crestview and for himself; and the defendant, cross-complainant and respondent, Leonard Dieden, also an attorney at law and the other party to the contract in dispute.

The record shows that, in 1956, Crestview owned some real property in an unincorporated area of Alameda County near the city of Hayward that it desired to develop as a cemetery. This was difficult under the existing county zoning laws, which Crestview and McKeever found to be confusing. McKeever, on behalf of himself and Crestview, employed attorney Marlin Haley to secure the necessary authority to conduct a cemetery on the premises. Haley and McKeever apparently concluded that the desired purpose could best be attained if the land in question were first annexed by the city of Hayward. Whether McKeever and Haley sponsored the annexation we do not know, but we do know that the Crestview land was annexed to the city as part of a much larger tract. In the city ordinance the Crestview land was placed in a residential zone. Haley attempted to secure a variance, so as to permit the land to be used for cemetery purposes. He was unsuccessful. He informed McKeever that competing cemetery interests had prevented him from accomplishing the desired purpose, confessed his inability to secure the variance, and asked to withdraw from his employment. McKeever agreed to the withdrawal, and paid Haley for his services.

In April of 1956 Leonard Dieden was recommended to McKeever by Haley as an attorney who might be able to secure the desired result. McKeever talked to Dieden by telephone and arranged to meet him in Haley's office in Hayward to discuss the prospective employment. This meeting was held on April 23, 1956, and was attended by McKeever, Dieden and Haley. As a result of this meeting, and several subsequent telephone conversations, appellants and Dieden entered into an oral contract, the terms of which were finally agreed upon on May 14, 1956, whereby appellants agreed to pay Dieden $7,500 on condition Dieden perform certain acts. The nature, purpose and terms of this contract are the key problems presented on this appeal. So far as the terms of that contract related to what Dieden was to do to earn his fee, they were fixed at the meeting of April 23, 1956. The subsequent conversations all related to the nature and amount of the fee.

All three of the participants in the conference of April 23rd testified as to what was then said and agreed upon. They generally agree upon the words that were then used but differ materially as to what those words meant, and were intended to mean. All agree that McKeever stated that he wanted to employ Dieden under a contingent contract and that he agreed to pay him $7,500 if a certain result was secured. It is the theory of appellants that the result desired was that Dieden was to take whatever steps he thought advisable to make the land available for cemetery purposes, and that the fee was not to be payable unless or until the land was made so available. It is the contention of Dieden, and the trial court so found, that he was employed to secure a rezoning of the land from residential to commercial, and that he earned his fee when he secured passage of such an ordinance.

Dieden testified that McKeever asked him what he would charge to make the land available for cemetery purposes. He replied his fee would be $10,000, $3,500 payable in advance. McKeever demurred, stating that any fee would have to be contingent on success. As a result of several later telephone conversations the figure of $7,500 was agreed upon as the contingent fee. It was agreed that Dieden should have three months to try and secure the desired result.

Haley testified at some length about what was said at the conference. He stated that McKeever told Dieden that he wanted to establish a cemetery on his property and asked

Dieden if he was willing to accept employment to secure whatever was necessary from the city to accomplish that result. McKeever then stated that whether Dieden was to try and secure a variance permit or a rezoning was up to Dieden. Everyone at the conference, however, knew that Haley had been unable to secure a variance. McKeever told Dieden that "[t]he contingency was based upon Mr. Dieden being able to secure whatever rezoning or permit was necessary from the City of Hayward to enable them to establish a cemetery on the property." Haley indicated that it was his understanding that Dieden was to obtain either rezoning or a permit or both from the city so as to enable the McKeever group to establish a cemetery on the property. Dieden replied that if the property was rezoned a permit would probably not be required.

McKeever generally agreed with this testimony.

It is the theory of appellants that Dieden was employed for the purpose of making the land available for cemetery purposes, or at least was not to be paid unless he secured a rezoning ordinance that became operative. It was the theory of Dieden that he was engaged to secure a rezoning of the land from residential to commercial, and that he performed this task.

After the parties agreed upon the contingent fee on May 14, 1956, Dieden started to work. He prepared a letter to the Hayward Planning Commission, which was executed by McKeever, requesting a rezoning of the property. Dieden then prepared and filed an application for rezoning and actively argued in favor of the application at several hearings at which vigorous opposition to his position developed. On July 24, 1956, the city council passed an ordinance by which the Crestview lands were rezoned from "Zone 1 Residential Low Density" to "Zone 3 Business and Commercial." At this meeting of the council McKeever and Dieden were present. At that time neither knew of the provisions of the law applicable to the referendum as applied to city ordinances. The meeting was well attended, and several arguments for and against the rezoning were made. After the ordinance had passed by a vote of four to three a recess was called. At that time a woman who had opposed the rezoning ordinance told McKeever and Dieden that her group intended to continue to attack the ordinance by referendum. Dieden then found out from the city attorney the percentage of signatures necessary to validate a referendum and reported this to McKeever.

McKeever congratulated Dieden on having completed his job so successfully and Dieden said "There's your permit. Send me a check." This McKeever promised to do. Three days later, on July 27, 1956, and after McKeever knew that the referendum was pending, he sent Dieden a check for $5,000. He stated in the accompanying letter that this $5,000 was "on account of your legal fee in the amount of $7,500.00 for services in connection with the adoption of a rezoning ordinance . . . on behalf of Crestview Cemetery Association.

"I will have the balance for you shortly. One of my associates is out of town.

"May I take this opportunity to compliment you on a very fine piece of work. Your comprehensive coverage of a delicate and difficult situation and your masterly presentation of the facts deserve great commendation, particularly in view of the type of opposition which was arrayed against you."

Dieden thereafter made several telephone calls to McKeever requesting the balance of his fee and McKeever on each occasion promised to pay. During one of these conversations Dieden told McKeever about how the referendum was progressing. McKeever at these times never contended that the contracted-for services had not been performed but to the contrary always promised to pay the $2,500 balance owed as soon as he could contact his associates.

The referendum qualified within the time prescribed by law by the filing of the requisite number of signatures. This gave the city council the election of calling a special election or of repealing the rezoning ordinance. The council selected the latter procedure and repealed the ordinance on September 11, 1956. McKeever then refused to pay the balance claimed, and demanded a refund of the $5,000 paid on the ground that Dieden had not fully performed the contract.

The parties being unable to agree, Crestview brought this action against Dieden for the $5,000 paid to him alleging a cause of action on a common count for money had and received. Dieden, by way of answer, filed a general denial and cross-complained against Crestview and McKeever for the $2,500 still claimed to be due him. The cross-complaint alleges that Dieden performed legal services at appellants' special instance and request "consisting of preparing, drawing and engrossing various instruments in writing and in counselling and advising the . . . [appellants] and each of them in connection with the rezoning of certain real property" owned by appellants

"from Zone 1 Residential Low Density to Zone 3 Business and Commercial"; that for these services appellants agreed to pay Dieden $7,500, the reasonable value of the services. Payment of $5,000 is alleged with $2,500 unpaid, for which sum Dieden prayed judgment.

Appellants, by way of answer to the cross-complaint, denied its material averments, and by way of affirmative defense alleged that Dieden was employed by appellants to do those things necessary to permit appellants to erect, maintain and operate a cemetery on the premises in question, for which services appellants agreed to pay Dieden $7,500 upon completion of such services; that such services were to be performed by Dieden within three months of the date of the agreement or he was to receive no compensation; that the three months have elapsed and the promised services have not been performed in that appellants are not "authorized by permit, re-zoning, or any other means to operate a cemetery" on the lands; that Dieden has "ceased from any effort" to comply with the terms of the contract; that the appellants paid to Dieden the $5,000 "in error, believing that the said CRESTVIEW CEMETERY ASSOCIATION was empowered and authorized to operate said cemetery upon said land, but since the date of said payment have learned that said CRESTVIEW CEMETERY ASSOCIATION is not so authorized to operate" a cemetery on the land.

On the issues thus framed the cause proceeded to trial before the court without a jury. The trial court held that appellants were not entitled to recover the $5,000 and that Dieden was entitled to recover the $2,500 on his cross-complaint, and entered its judgment accordingly.

The findings are couched substantially in the language of the cross-complaint. It is found that Dieden and McKeever, the latter acting on his own behalf and on behalf of Crestview, entered into an oral contract on May 14, 1956, whereby it was agreed that Dieden "was to take all necessary steps to comply with the City Charter of the City of Hayward and applicable ordinances of said City in order to present to the Planning Commission and the council of the said City an application for re-zoning of certain land" owned by appellants "which said land if re-zoned and made available for cemetery uses and purposes was to be developed and operated" by appellants as a nonprofit corporation. It is then found that what Dieden was required to do to earn his fee under the contract "was to secure the re-zoning of said land from resi-

dential to commercial'' and that Dieden was to have a period of three months from May 14, 1956, ''to secure an ordinance adopted by the City Council of the City of Hayward re-zoning said property from residential to commercial and that when the said re-zoning was accomplished and effected through the adoption of an ordinance by the City Council of the City of Hayward re-zoning said land from residential to commercial'' Dieden ''was to receive as and for his services in accomplishing the said re-zoning the sum of'' $7,500. It is then found that Dieden prepared and appellants executed an application for rezoning of the property from residential to commercial; that said application was acted on by the commission; that thereafter the city council passed the rezoning ordinance; that three days later appellants paid Dieden $5,000 as ''partial payment for the agreed compensation of $7,500.00''; that Dieden ''has fully performed all the covenants, conditions and agreements required to be performed by him under said oral agreement''; that as a result appellants owe to Dieden the unpaid balance of $2,500; that the contract between the parties was not the one pleaded by appellants but the one as found by the court; that the payment of the $5,000 by appellants to Dieden ''was not in error'' but in pursuance of the agreement of the parties.

Judgment was entered in favor of Dieden and against both appellants for the sum of $2,500. From this judgment McKeever and Crestview appeal.

The basic contention of appellants is that these findings, particularly those relating to the terms of the contract, are not supported, but are contrary to the uncontradicted evidence. It is urged that the evidence shows without contradiction that the contingency agreed upon was that Dieden was to take all necessary legal steps to make the land available for cemetery purposes and that he did not perform.

In determining what the parties agreed upon and intended by their agreement of May 14, 1956, we are not to determine what the words used by the parties may mean to us but if possible to ascertain what those words meant to the parties. Moreover, in interpreting those words we must keep in mind that McKeever and Dieden were not novices or inexperienced. Both are practicing attorneys.

Haley had been employed by McKeever to secure a variance. Obviously, after annexation, since the land was then in a residential zone, the only way a cemetery could be operated on the property was either to secure a variance or a rezoning. McKeever knew this. He also knew that Haley

had been unable to secure a variance. While there is substantial evidence that McKeever wanted to be assured the land would be available for cemetery purposes, the evidence is capable of being interpreted as meaning that Dieden was to secure the passage of a rezoning ordinance. While this may not be the interpretation that we might place upon the terms of the contract, it is the interpretation placed upon it by the parties before any controversy arose between them. This contract is not to be interpreted in a vacuum. These two lawyers knew what they meant and intended. By their actions, and by their performance under the contract, their intent was disclosed with crystal clarity.

In the first place McKeever insisted that Dieden must perform within a period of three months. That period of time may be a reasonable one for securing an amendment to an ordinance but is not reasonable if it was intended that Dieden, after passage of the ordinance, was to protect it against attacks that might be made on it. Then, almost immediately after the contract was entered into, Dieden prepared a letter to the planning commission asking for a rezoning of the area and McKeever signed it. Dieden then prepared and filed an application for rezoning. Dieden, in the presence of McKeever, argued the matter before the council against strong opposition, and finally, again in the presence of McKeever, secured passage of the controversial ordinance. Then, most significantly, McKeever congratulated Dieden on a job well done. Dieden, in the obvious belief that his job was completed, requested his money. McKeever, even though he knew the opponents were contemplating a referendum, and knew the required number of signatures for a referendum, in the obvious belief that Dieden had completed the job contemplated, promised to pay. Three days later, and after McKeever knew the opponents to the ordinance were working on a referendum, McKeever sent the $5,000 check to Dieden ''on account of your legal fee . . . in connection with the adoption of a rezoning ordinance,'' and promised to send the balance owed in a few days. In subsequent telephone conversations he promised to send the balance, making no contention that the work contemplated by the contract had not been completed. The only reasonable interpretation of these actions is that both parties then believed, and acted on the belief, that the work contemplated had been completed and that Dieden had earned his fee.

That the actions of the parties should be used as a

reliable means of interpreting an ambiguous contract is, of course, well settled in our law. Supported by many authorities this rule is summarized in 12 Cal.Jur.2d, section 129, page 341, as follows: "The acts of the parties under the contract afford one of the most reliable means of arriving at their intention; and, while not conclusive, the construction thus given to a contract by the parties before any controversy has arisen as to its meaning will, when reasonable, be adopted and enforced by the courts." The rule was applied by this court in *Universal Sales Corp.* v. *California etc. Mfg. Co.*, 20 Cal.2d 751 at page 761 [128 P.2d 665] as follows: "Also applicable here is the familiar rule that when a contract is ambiguous, a construction given to it by the acts and conduct of the parties with knowledge of its terms, before any controversy has arisen as to its meaning, is entitled to great weight, and will, when reasonable, be adopted and enforced by the court." The court explained the rationale of this rule as follows (20 Cal.2d at p. 761) : "The reason underlying the rule is that it is the duty of the court to give effect to the intention of the parties where it is not wholly at variance with the correct legal interpretation of the terms of the contract, and a practical construction placed by the parties upon the instrument is the best evidence of their intention. [Citing authorities.] As was said in *Mitau* v. *Roddan,* 149 Cal. 1, 14 [84 P. 145, 6 L.R.A. N.S. 275] : 'It is to be assumed that parties to a contract best know what was meant by its terms, and are the least liable to be mistaken as to its intention; that each party is alert to his own interests, and to insistence on his rights, and that whatever is done by the parties contemporaneously with the execution of the contract is done under its terms as they understood and intended it should be. Parties are far less liable to have been mistaken as to the intention of their contract during the period while harmonious and practical construction reflects that intention, than they are when subsequent differences have impelled them to resort to law, and one of them then seeks a construction at variance with the practical construction they have placed upon it. . . . In its execution, every executory contract requires more or less of a practical construction to be given it by the parties, and when this has been given, the law, in any subsequent litigation which involves the construction of the contract, adopts the practical construction of the parties as the true construction, and as the safest rule to be applied in the solution of the difficulty. (Citing cases.)' "

Particularly applicable here is the following language

of the Roddan case (149 Cal. 1, 14): "This was a practical construction placed upon the contract by the parties themselves, which renders it immaterial to consider what might be the literal construction of its terms. Parties to a contract have a right to place such an interpretation upon its terms as they see fit, even when such an interpretation is apparently contrary to the ordinary meaning of its provisions."

This rule of practical construction is predicated on the common sense concept that "actions speak louder than words." Words are frequently but an imperfect medium to convey thought and intention. When the parties to a contract perform under it and demonstrate by their conduct that they knew what they were talking about the courts should enforce that intent.

Appellants correctly claim that this doctrine of practical construction can only be applied when the contract is ambiguous, and cannot be used when the contract is unambiguous. That is undoubtedly a correct general statement of the law. (*Bettis Rubber Co.* v. *Kleaver,* 104 Cal.App.2d 821, 826 [233 P.2d 82] ; *Dabney* v. *Dabney,* 9 Cal.App.2d 665, 670 [51 P.2d 108].) But the question involved in such cases is ambiguous to whom? Words frequently mean different things to different people. Here the contracting parties demonstrated by their actions that they knew what the words meant and were intended to mean. Thus, even if it be assumed that the words standing alone might mean one thing to the members of this court, where the parties have demonstrated by their actions and performance that to them the contract meant something quite different, the meaning and intent of the parties should be enforced. In such a situation the parties by their actions have created the "ambiguity" required to bring the rule into operation. If this were not the rule the courts would be enforcing one contract when both parties have demonstrated that they meant and intended the contract to be quite different.

If these rules be applied to the instant case the meaning of the parties becomes clear. When the city council passed the ordinance both Dieden and McKeever believed and demonstrated by their actions to a certainty that they believed that Dieden had successfully completed the work called for by the contract. McKeever, even after he knew that a referendum was pending, paid the $5,000, and promised the balance, in the obvious belief that Dieden had done everything necessary to earn his fee. It was not until the referendum was

successful and the council had repealed the ordinance that McKeever apparently conceived the idea that he had entered into a bad bargain, and sought to be released from that bad bargain on the theory that something more was required of Dieden. The practical construction placed on the contract by the parties is far more convincing than the construction arrived at in an attempt to escape a liability already accrued.

In apparent recognition of the fact that the payment of the $5,000, the letters sent to Dieden, and the subsequent conversations are certainly inconsistent with their present claimed interpretation of the contract, appellants urge that all of these occurred as the result of "a fundamental mistake which is difficult to understand." The trial court, on conflicting evidence, has found that there was no mistake. This would seem to be conclusive. But appellants argue that there was a mistake because both parties as a matter of law "did not realize that the job was not done." But the evidence shows that they did realize that very fact. They knew on the night the ordinance was passed that a referendum was contemplated. Shortly thereafter they knew a referendum petition was circulating. Certainly, if they knew these facts they are chargeable with knowledge that the referendum might be successful. In spite of this knowledge they both thereafter acted as if the contract had been fully executed. This being so, the finding of no mistake is supported.

Appellants next contend that even if their contended-for construction is incorrect, and even if Dieden was employed simply to secure passage of the rezoning ordinance, at the very least that meant securing passage of an effective ordinance, and no such effective ordinance was passed because, as a result of the referendum, the ordinance was repealed before it became effective. This contention is predicated upon an interpretation of the state law applicable to referendums.

The City Charter of Hayward provides, in section 620, that "An ordinance shall become effective upon the date of its adoption, unless the effective date is otherwise stated in the ordinance." But section 403 of the charter also provides: "Except insofar as is otherwise provided by ordinances hereafter enacted, the provisions of the Elections Code of the State of California . . . governing the initiative, the referendum and the recall of municipal officers shall apply to the use thereof in the City insofar as the same are not in conflict with this Charter."

It is provided in article IV, section 1, of the state Constitution that:

"The initiative and referendum powers of the people are hereby further reserved to the electors of each . . . city and town of the State to be exercised under such procedure as may be provided by law. . . . This section is self-executing, but legislation may be enacted to facilitate its operation, but in no way limiting or restricting either the provisions of this section or the powers herein reserved."

Article XI, section 8, of the Constitution permits a city to adopt a charter that is consistent with the Constitution. It is there provided: "It shall be competent in any charter framed under the authority of this section to provide that the municipality governed thereunder may make and enforce all laws and regulations in respect to municipal affairs, subject only to the restrictions and limitations provided in their several charters and in respect to other matters they shall be subject to general laws."

Section 1770 of the Elections Code provides that no ordinance shall become effective until 30 days from and after the date of its final passage, with certain exceptions not here relevant. Section 1771 of that code provides that if, within that 30 days, a petition signed by 10 per cent of the voters in the city is filed protesting the ordinance, "the effective date of the ordinance shall be suspended," and the legislative body of the city shall "reconsider" it. Section 1772 provides that if the legislative body does not repeal the ordinance, an election shall be held, in which event the ordinance does not become effective unless a majority of the voters favor it.

Under these provisions, the argument that, in spite of section 620 of the city charter, ordinances of the city of Hayward do not become "effective" until 30 days after their passage, and not then if, as here, the required number of signatures to a referendum are filed within the 30-day period, seems sound. ▮ It is well settled that while a chartered city may, under the home rule provisions of article XI, section 8, of the Constitution determine its own method for the referendum of city ordinances it cannot prevent the operation of an effective referendum procedure (*Hopping* v. *Council of City of ·Richmond,* 170 Cal. 605, 609 [150 P. 977] ; *Brown* v. *Boyd,* 33 Cal. App.2d 416, 421 [91 P.2d 926]). Thus it may be assumed that this rezoning ordinance never became "effective" in the sense that it was subject to a referendum. Such assumption does not aid appellants. ▮ The trial court found that the

contract of May 14, 1956, was fully performed. That necessarily means that the parties contracted and agreed that the service required of Dieden was to secure passage of the rezoning ordinance, and that what might happen thereafter was immaterial. Certainly the parties so interpreted the contract. As already pointed out both Dieden and McKeever obviously believed the contract had been fully performed even after they knew that a referendum was to be attempted and was in process. For the reasons already stated that interpretation is binding on the parties.

The judgment is affirmed.

Gibson, C. J., Traynor, J., Schauer, J., McComb, J., White, J., and Dooling, J., concurred.

Appellants' petition for a rehearing was denied November 23, 1960.