[Civ. No. 12168. Third Dist. Mar. 2, 1970.]

SACRAMENTO-YOLO PORT DISTRICT, Plaintiff and Respondent, v. CARGILL OF CALIFORNIA, INC., Defendant and Appellant.

COUNSEL

Chickering & Gregory, John Philip Coghlan, Harry A. Jackson, Jr., and Leslie P. Jay for Defendant and Appellant.

Fitzwilliam, Memering, Stumbos & DeMers and Robert Memering for Plaintiff and Respondent.

OPINION

PIERCE, P. J.—Plaintiff Sacramento-Yolo Port District ("Port") recovered a summary judgment against defendant Cargill of California, Inc. ("Cargill"), its lessee, for fire damage to the leased premises caused by Cargill's negligence. Judgment was for $72,500. Cargill appeals. It correctly contends that before the fire Port had undertaken to insure the premises for such loss with provision in its policies for waiver of subrogation. Such clause allows release of the insured's lessee from liability to the insurer for the latter's outlay in paying the fire loss. (Here there was full

coverage and full payment.) An additional premium was charged, and paid, for the inclusion of the "waiver of subrogation" endorsement on the several insurance policies involved.[1]

In the proceedings for summary judgment there was an agreed statement of facts. The leased building was a grain elevator. It had been leased to Cargill's predecessor under a lease made in 1949, subsequently assigned to Cargill. Certain provisions of this lease will be adverted to in the discussion below. The correspondence which supports Cargill's claimed defense to liability was exchanged between the parties in June and July 1958. The fire occurred in January 1964. As stated, Cargill agrees it was caused by its negligence. This action was commenced on May 18, 1965. Negotiations for settlement took place during pendency thereof. On April 12, 1967, an oral settlement occurred under which (this court is informed) Cargill would have paid the $72,500. Five days later the correspondence upon which it relies—and which had been mislaid by this apparently sizable corporation throughout the previous settlement negotiations—came to light. Cargill notified Port. It is not contended by Port or its insurers, and was not contended during the hearing on the proceedings for summary judgment, that Cargill is bound by the oral, unexecuted, settlement agreement.

### The 1949 Lease

The original (1949) lease contains no provision definitive of the risk of loss of, or damage to, the leased premises because of fire; nor does it cover whose obligation it is to keep the premises insured from that casualty. It does, in paragraph 7, include a standard termination provision in the event of a fire loss amounting to more than 50 percent of the value of the leased premises. If a less than 50 percent fire loss, or loss "from some unforeseen or extraordinary cause not the fault or negligence of Lessee" occurs, lessor agrees to repair. It will be noted that the words "fault or negligence of Lessee" modify "some unforeseen or extraordinary" loss and damage by fire.

Paragraph 10 is also the standard clause waiving sections 1941 and 1942 of the Civil Code (obliging the lessor to make repairs). But, as a part of that clause requiring the lessee to make repairs at its own expense, "damage by fire or other casualty [is] excepted." In a third standard clause (paragraph 11) lessee "[s]ubject to the exceptions specified in Paragraph 10 immediately preceding" promises not to commit waste and to surrender the premises in good repair.

---

[1]It is acknowledged that this action, although prosecuted in the name of Port, is prosecuted for the benefit of the insurers who will recover back the $72,500 paid out to Port if this judgment stands.

None of these provisions expressly cover with certainty the issues for or against the respective parties. They just skirt the fringes. Port relies upon *Morris* v. *Warner* (1929) 207 Cal. 498 [279 P. 152]. That, however, was a case resting *upon nothing but the "fringes."* The lease there involved contained standard clauses similar to those we have outlined. Plaintiff lessee had sued defendant lessor to restore a leased building totally destroyed by fire. (Instead of a 50 percent value restoration clause, lessor was obligated to repair if restoration could be accomplished within 60 days.) Defendant lessor cross-complained, contending the fire loss was caused by the lessee's negligence. He sought damages caused thereby. The trial court found such negligence and awarded damages on the cross-complaint. Our Supreme Court affirmed. The existence or nonexistence of an obligation to maintain insurance was not involved in the case, nor was there any issue arising from the failure of lessor (or for that matter, either party) to keep the premises insured against loss by fire—whether the fire was negligently or nonnegligently caused. The court (on p. 506) expressly declined to consider in its opinion the question of insurance, saying: "[T]he pleadings and evidence are absolutely silent on the insurance feature." And it added that lessee, having failed to bring the matter to the trial court's attention, was precluded from doing so on appeal.

The lease provisions which we have discussed furnish nothing but a framework within which to discuss the 1958 correspondence. It is upon the basis of the latter, as supplementing or interpreting the provisions of the lease, that the issue before this court must be decided.

### The June-July 1958 Correspondence

We quote the relevant part of the 1958 correspondence between Port and Cargill:

(Cargill to Port)

"June 5, 1958

"It is our understanding that under the provisions of the lease dated September 10, 1949 between the Port District and Kerr-Gifford & Co. Inc. of California, which lease was assigned to Cargill of California, Inc., you have undertaken to insure the premises against risks of fire, wind storm, flood, etc. Would you be so good as to advise us whether this understanding is correct? If so, does the insurance policy contain a 'Waiver of Subrogation' clause *releasing the lessee* from any liability to the insuror?" (Italics ours.)

(Port to Cargill)

"June 24, 1958

"Reference is made to your inquiry of June 5, 1958 with respect to insurance covering our Port District grain elevator against risks of fire, wind, storm, flood, etc.

"We do have such a policy, but there is, however, no insurance against flood.

"Upon checking with our insurance underwriters and reviewing our policies, I find they do not have a 'Waiver of Subrogation' clause *releasing the lessee* from any liability to the insurer. *We can, however, have our underwriters attach a Subrogation Waiver clause if you find it desirable.*

'Awaiting your reply as to your desire in the matter, I remain, . . ." (Italics ours.)

(Cargill to Port)

"June 27, 1958

"We would very much appreciate your requesting your underwriters to include a 'Waiver of Subrogation' clause in policies written on premises leased to ourselves."

(Port to Cargill)

"July 2, 1958

"In response to your letter of June 27, 1958, we have asked our insurance underwriters to attach to our policies covering premises under lease to Cargill of California, Inc., a 'Waiver of Subrogation' clause."

(Port to Cargill)

"July 25, 1958

"It is the policy of our Port District Commission to spread our fire insurance on port properties among thirteen Sacramento insurance brokers or agencies. We have, therefore, had each of these brokers supply us with the subrogation clause, a printed copy of which is enclosed.[2] These are now being attached to each of the thirteen policies.

---

[2]The waiver endorsement enclosed reads as follows:

"12. SUBROGATION WAIVER CLAUSE: This insurance shall not be prejudiced by agreement made by the named Insured releasing or waiving the named Insured's right of recovery against third parties responsible for the loss, under the following circumstances only:

"I trust that this will serve your purpose. The effective date of these subrogation endorsements is July 3, 1958."

■ This court finds no possible doubt of the intent of the parties as reflected by the correspondence recited above. Cargill's letter to Port dated June 5, 1958, expresses an "understanding" that Port has undertaken to carry fire insurance on the leased premises, and the stated understanding included the belief that the insurance was for the benefit of both Port and Cargill because Cargill mentions a "Waiver of Subrogation" clause, the effect of which would protect Cargill as lessee as well as Port. Port's reply of June 24 says it *does* have fire insurance but no waiver of subrogation clauses are included therein. Therefore, its policies did not include all the protection to Cargill the latter thought it had. But Port tells Cargill: "We can, however, have our underwriters attach a Subrogation Waiver clause if you find it desirable." Port awaits Cargill's expression of its desire. Cargill obviously did desire that protection and expressed it in its reply of June 27 in which it expressly informs Port of its wish to be protected and requests a waiver clause. On July 2 Port not merely states it *will* meet this wish; it affirms it had already taken care of it. It makes the affirmance doubly clear by enclosing the form of endorsement it had obtained.

The instrument received was called a "Subrogation Waiver Clause." Its caption is imprecise. ■ A "subrogation" as applied to an insurer is its right to be put in the position of its insured against third parties legally responsible to the insured for the loss or damage (i.e., the casualty) which the insurer has insured and to the extent of the amount paid. ■ By the terms of the "subrogation waiver" clauses here the insurers did not surrender that right. In it they stated: "the named Insured's [i.e., Port's] right of recovery against third parties responsible for the loss" may be released by the insured, and they add: "such agreement may run in favor of any third party." That, rather than constituting a waiver of subrogation, is more accurately expressed as consent to a surrender of the value of the right of subrogation as against a specified class of third parties of which Cargill, the

---

"(A) If made before loss has occurred, such agreement may run in favor of any third party;

"(B) If made after loss has occurred, such agreement may run only in favor of a third party falling within one of the following categories at the time of loss:

"(1) A third party insured under this policy; or

"(2) A corporation, firm, or entity (a) owned or controlled by the named insured or in which the named insured owns capital stock or other proprietary interest, or (b) owning or controlling the named insured or owning or controlling capital stock or other proprietary interest in the named insured;

"(C) Whether made before or after loss has occurred, such agreement must release or waive the entire right of recovery of the named insured against such third party."

lessee, was one.[3] In fact Cargill as lessee was the very party at whose request, and for whose benefit, the endorsement was obtained by Port.

It is not reasonable to say that Cargill must be named. The clause is more extensive than a clause merely protecting a lessee.

■ It is not reasonable to say that some written expression of agreement other than the exchange of letters was necessary to give the agreement life. Port, having acceded to Cargill's written request, having also evidenced its agreement and demonstrated its consent by compliance therewith, had left nothing further to be done. The agreement was complete. The legal effect is the same whether we call this transaction a new contract or rely upon the rule that the interpretation given to a contract by the subsequent conduct of the parties with knowledge of the contract's terms, before any controversy as to its meaning has arisen, is, when reasonable, to be adopted by the court. (*Crestview Cemetery Assn.* v. *Dieden* (1960) 54 Cal.2d 744 [8 Cal.Rptr. 427, 356 P.2d 171].) There the Supreme Court says, at page 754: "If this were not the rule the courts would be enforcing one contract when both parties have demonstrated that they meant and intended the contract to be quite different." (See also *Universal Sales Corp.* v. *California etc. Mfg. Co.* (1942) 20 Cal.2d 751, 761 [128 P.2d 665].)

Since it makes no difference whether a contract modification occurs in a modification of the lease or via correspondence, *Fred A. Chapin Lbr. Co.* v. *Lumber Bargains, Inc.* (1961) 189 Cal.App.2d 613 [11 Cal.Rptr. 634], becomes significant. There a fire was caused (as here) by lessee's negligence. Lessor had agreed to take out, pay for and maintain fire insurance on the premises. The trial court concluded that this provision meant that the lessor had agreed to insure the premises for the benefit of both the lessor and the lessee. On appeal that holding was affirmed. The reviewing court accepted the trial court's statement in its opinion (on p. 616): " '. . . There can be no reason for this paragraph unless it was intended that the buildings would be so insured that any fire loss would be paid out of the insurance." (*Chapin* might very well serve as the authority decisive of the issue now before this court. Further quotation from its opinion would be redundant, but we subscribe to its reasoning.) (See also *General Mills* v. *Goldman* (8th Cir. 1950) 184 F.2d 359.)

The contention is made by Port that the 1958 correspondence was not intended to extend fire insurance protection for the benefit of Cargill because so to construe it would be to create an indemnification absolving a party from its own negligence. Civil Code section 1668 is cited as the

---

[3]Herein, because the insurer itself and the parties have used the term, we will use "subrogation waiver" (words of art) as describing this endorsement.

"public policy" statute and *Vinnell Co.* v. *Pacific Elec. Ry. Co.* (1959) 52 Cal.2d 411 [340 P.2d 604], as case law making that construction untenable.

██ But Civil Code section 1668 has never been construed as meaning, and certainly was not intended to provide, that an owner or other party interested in property could not insure the premises against damage by fire caused by his own negligence—fortunately. Otherwise, few insured fire claims would be paid without controversy and most would require litigation.

In *Vinnell Co.* v. *Pacific Elec. Ry. Co., supra,* 52 Cal.2d 411, plaintiff had contracted with a flood control district to construct a part of a storm drain. The work to be performed ran through defendant's railroad's yards. In the contract between plaintiff and defendant which gave plaintiff access a clause was included in which plaintiff indemnified the railroad as to injuries resulting from the work to be done. An injury occurred. It resulted from the work done, but it was due to the railroad's own negligence. The railroad contended the clause mentioned exculpated it from its negligence. The court held that that had not been the intent of the parties. The contract involved in *Vinnell Co.* bears no resemblance to the one before this court. It is apparently stressed by Port because of language therein saying that a rule of "strict construction" should be applied in California to questionable expressions of intent in clauses claimed to protect a defendant from his own negligence. That rule need not be doubted. ██ Applicable here, however, is another rule which we take from *General Mills* v. *Goldman, supra,* 184 F.2d 359, where the court says at page 366: "[T]he highest public policy is found in the enforcement of the contract as it was actually made." Both Civil Code section 1668 and *Morris* v. *Warner, supra,* 207 Cal. 498, are referred to and distinguished in *Fred A. Chapin Lbr. Co.* v. *Lumber Bargains, Inc., supra,* 189 Cal.App.2d 613, at page 616, where the court points out that the public policy codified by the section referred to "does not purport to prohibit the parties to a contract from agreeing that one of them shall maintain fire insurance and apply the proceeds therefrom toward the reimbursement of any fire loss covered by such insurance, although caused by the other's negligence. [Citations.]" On the same page *Morris* was distinguished. The distinction was simple—there damage caused by the lessee's negligence was not intended to be included.

██ Here it bears repetition for emphasis—when a lessee contracts with a lessor for the latter to maintain fire insurance and to obtain waiver of subrogation clauses in its policies, in the very nature of the transaction, absolution of risk of loss from the lessee's own negligence has to be a prime purpose of the contract.

### The A Posteriori Reasoning of the Parties

A new "master" lease was negotiated between the parties in 1963. Originally it contained no express language under which Port agreed to keep the leased premises insured against damage by fire for the benefit of both parties; no provision absolving Cargill from liability for fire damage due to its negligence. Although the new lease was made in 1963, it did not take effect until May 1, 1965. Sometime prior to June 1, 1965, the parties commenced negotiations regarding the inclusion of a clause containing such provisions. In November 1965 a specific clause to that effect was written, and on May 16, 1966, it was included in an amendment of the lease. Meanwhile, that lease as originally written had included a provision: "It is understood that Lessor is under no obligation to provide fire insurance coverage *for the contents* of any structure covered by this agreement." (Italics ours.)

The respective parties draw differing inferences from the facts recited under the above caption. Cargill argues that the quoted reference to lessor's freedom from any obligation to insure "contents" strongly implies an assumption of an obligation to insure the structures themselves. Port contends that the fact that in May 1966 the parties effected Port's obligation to carry insurance on the structure, thus abrogating Cargill's negligence liability (*pro tanto*) by lease amendment, establishes an intent that a lease amendment was the *only* method by which such ends could be attained. We disagree with both postulations. If the methods employed by the parties have any significance, it would seem to be that Cargill, after a fire had occurred and after a controversy had arisen, and after a law suit had been filed, deemed it wise to obviate future controversy by anchoring Port's obligation to the lease itself. A greater probability is, having in mind the extreme informality of the parties in all of the transactions involved in this litigation, that no significance attaches to any of the postfire happenings.

Judgment is reversed. Since the appeal is before this court on a stipulated statement of facts, the cause is remanded with directions to the trial court to enter judgment for Cargill.

Regan, J., and Bray, J.,* concurred.

---

*Retired Presiding Justice of the Court of Appeal sitting under assignment by the Chairman of the Judicial Council.