[Civ. No. 1178. Fifth Dist. Sept. 18, 1970.]

LORREN J. KUFFEL et al., Plaintiffs and Respondents, v. SEASIDE OIL COMPANY, Defendant and Appellant.

**COUNSEL**

Price & Martin and C. Rex Boyd for Defendant and Appellant.

Robert R. Elledge for Plaintiffs and Respondents.

## OPINION

GARGANO, J.—This action for general and punitive damages is based on fraud arising out of a contract. It was instituted by plaintiffs Lorren J. Kuffel and Ellen M. Kuffel against the Seaside Oil Company and Forrest LaVerne McCauley, Seaside distributor for the Modesto area. Subsequently, the action was dismissed as against McCauley and, after issue was joined on the complaint and Seaside's counterclaim, the cause proceeded to trial before the court sitting without a jury. At the conclusion of the trial the court awarded plaintiffs $212,269.48 in general damages; it fixed punitive damages at $10,000. The court also entered judgment in favor of Seaside on the counterclaim for $23,264.63. Seaside has appealed.

Plaintiffs, since May of 1946, have been engaged in the business of selling gasoline and related products from a service station located in Riverbank, California; for almost 20 years plaintiffs sold Seaside gasoline exclusively; initially, the gasoline was sold pursuant to a written agreement with a fixed term; in 1954 the agreement was re-negotiated, and Seaside was given the right to terminate upon giving plaintiffs 15 days' written notice; Lorren Kuffel was told that the termination clause would not be invoked unless he did something "badly."

In 1960 plaintiffs improved their service station with the proceeds of a $47,000 loan acquired from the Crocker-Anglo National Bank after plaintiffs and Seaside had entered into the following transactions: On April 8, 1960, plaintiffs leased their gasoline station to Seaside for a period of 10 years, commencing June 1, 1960, and ending May 31, 1970, at a monthly rental of $525.38. The term of that lease, hereafter referred to as the Kuffel-Seaside lease, was the same as the loan term, and the monthly installments were equal to the loan payments. Then, the rental payable by Seaside was assigned to the bank as security for its loan. On April 9, 1960, Seaside leased the service station back to the plaintiffs for essentially the same term, June 1, 1960, to May 26, 1970, and at the same monthly rental; plaintiffs agreed to sell Seaside products exclusively from the leased premises. Thus, simultaneously with the execution of the second lease, hereafter referred to as the Seaside-Kuffel lease, the parties entered into a new written "sales contract" in which Seaside agreed to sell and deliver to plaintiffs all of plaintiffs' requirements for Seaside petroleum products for resale from the leased property. The term of the contract, like the second lease, was for 10 years, from June 1, 1960, to May 26, 1970. Seaside, however, reserved the right to terminate the contract by giving plaintiffs 15 days' prior written notice of its intention to do so. It also reserved the option to refuse to sell plaintiffs more than

20,000 gallons of gasoline during any calendar month. On the same day Seaside signed a letter agreement, agreeing to give plaintiffs an allowance of 2¢ a gallon on all purchases of gasoline in "truck and/or trailer" quantities to be applied by plaintiffs on the rental owed by them to Seaside; also, it was orally agreed that plaintiffs could pay for the gasoline delivered by Seaside at the end of the month next following the month of delivery.

In 1963 plaintiffs refinanced the service station through another bank, without relying on any security from Seaside. Then, they paid off the first loan. Afterward, the parties agreed to discontinue paying each other off-setting rentals. However, Seaside, by mistake, made two more rental payments amounting to $1,050.76, and Lorren Kuffel retained the money to offset certain subsidies he claimed he was entitled to receive from Seaside from reduced retail selling prices during depressed market periods. Kuffel's claim was disputed by Seaside. Nevertheless, Seaside and plaintiffs continued with their lease-leaseback arrangement until May 18, 1966. In the interim, Seaside continued to pay plaintiffs the 2¢ per gallon rental allowance, and with one minor revision the credit arrangement remained unchanged; in late 1966 plaintiffs, at Seaside's request, agreed to make the gasoline payments on the 25th day of the month next following the month of purchase.

On May 18, 1966, Mr. Forrest LaVerne McCauley, Seaside's vice president and sales manager, Mr. Al Von Rott, Seaside's district sales manager for the Sacramento District, and Mr. William G. McDowell, Seaside's distributor for the Modesto area, met with plaintiffs at plaintiffs' place of business, to discuss the leases and sales contract which the parties signed in 1960 and the disputed claim over the subsidies. The claim was settled first; the parties executed a settlement agreement in which plaintiffs were allowed to retain the two rental payments mistakenly made by Seaside in return for plaintiffs' release of all claims they may have had against Seaside for unpaid subsidies. Then, McCauley asked plaintiffs to sign the termination forms which Seaside had prepared for the termination of the leases and sales contract. He told the Kuffels that if they signed the forms, Seaside would continue to serve them on the same basis as before and promised a new sales contract containing the same terms and conditions as were contained in the old agreement. When a question was raised as to the whereabouts of the contract, McCauley said he had left it on his desk in Santa Barbara and would send it when he returned to that city. Plaintiffs signed the termination forms, but the new sales contract was never sent.

On May 19, 1966, a surprised Mr. Von Rott told plaintiffs that he had been notified by the Santa Barbara office that plaintiffs could not have

on credit the load of gasoline which was coming to take care of plaintiffs' weekend trade. The following morning Lorren Kuffel procured a cashier's check from the bank to pay for the gasoline and brought it to McDowell's office. McDowell said that he had orders not to take the check and informed Kuffel that plaintiffs were not going to get any fuel. Mr. Kuffel was desperate; he finally got a load of Goodrich Rocket brand gasoline to sell. Thereafter, plaintiffs continued to sell Goodrich gasoline, selling 654,624 gallons for the 12-month period from June 1, 1966, to May 31, 1967.

Contrary to Seaside's first contention, there is ample substantial evidence to support the trial court's finding that Seaside fraudulently induced plaintiffs to terminate the leases and sales contract the parties signed in 1960. Plaintiffs signed the termination forms which McCauley presented in reliance upon his promise that Seaside would continue to serve them on the same basis as before, and that they would receive a new sales contract containing the same terms and conditions as were contained in the old contract. This promise was never kept. It is the rule that a promise made with intent to deceive or to induce a person to enter into a contract, without any intention of performing, is actual fraud (Civ. Code, § 1572, subd. 4). And, it has been repeatedly stated that "[w]ithout the consideration of other evidence, the subsequent failure to perform [a promise] warrants the inference that [the promisor] did not intend to perform when [he] promised." (*Wilson* v. *Rigali & Veselich,* 138 Cal.App. 760, 765 [33 P.2d 455]; *Boyd* v. *Bevilacqua,* 247 Cal.App.2d 272, 292 [55 Cal.Rptr. 610]; *Wilkenson* v. *Linnecke,* 251 Cal.App.2d 291, 293 [59 Cal.Rptr. 290].)

The inference that Seaside did not intend to keep McCauley's promise also is buttressed by other convincing evidence. On the day following the execution of the termination agreements, Seaside suddenly and without warning, even to its district sales manager, Mr. Von Rott, cut off plaintiffs' credit. Then, when Lorren Kuffel produced a cashier's check, Seaside arbitrarily refused to sell plaintiffs the load of gasoline which plaintiffs needed to take care of their weekend trade. Seaside took this sudden inexcusable action despite the fact that plaintiffs had been selling the company's gasoline exclusively for some 20 years. Furthermore, plaintiffs produced a motive for Seaside's peculiar conduct. On May 18, 1966, the Tidewater Oil Company, of which Seaside is a part, was in the process of being sold to Phillips Petroleum. Under the terms of the sale, Tidewater was to retain all money collected on accounts receivable before July 14, 1966, and Phillips Petroleum was to receive all money collected thereafter. Because of the peculiar credit arrangement which Seaside had made with plaintiffs, it was to Seaside's distinct advantage to terminate its agreements with plaintiffs prior to June 1966; otherwise, Phillips Petro-

leum would have been entitled to receive all moneys payable to Seaside by plaintiffs for purchases of gasoline made during the month of June.

We turn to the damages. ■ It is clear that plaintiffs were entitled to be compensated for the loss of actual and prospective profits naturally and directly resulting from the fraudulent termination of Seaside's sales contract (*Caspary* v. *Moore*, 21 Cal.App.2d 694 [70 P.2d 224]). The court, therefore, could properly have awarded plaintiffs the difference between the net profits they could reasonably have anticipated making from the sale of Seaside gasoline for the unexpired term of the sales contract and the net profits they actually made and reasonably could have anticipated making from the sale of Goodrich Rocket brand gasoline over the same period. But, the court awarded plaintiffs a total of $212,269.48 in general damages, apparently believing that during the unexpired four-year period plaintiffs would have made at least $50,000 more per year from the sale of Seaside gasoline than they made and reasonably could have anticipated making from the sale of Goodrich Rocket brand gasoline. And, strangely, the court arrived at this conclusion even though both brands of gasoline are substantially equal in retail selling price and customer appeal, and notwithstanding the fact that in 1964 plaintiffs netted only $7,160 (plus drawings of $3,977) from their entire operation.

The trial court accepted plaintiffs' computation of actual and prospective loss of profits on a year to year basis. A brief review of plaintiffs' yearly computations is helpful.

### June 1966-May 1967

For the 12-month period commencing June 1, 1966, and ending May 31, 1967, immediately succeeding the termination of the Seaside contract during which plaintiffs sold 654,624 gallons of Goodrich gasoline, the Kuffels computed their actual profit loss in two separate steps. In the first step, they assumed that plaintiffs would have sold at least the same quantity of Seaside gasoline (683,473 gallons) as they sold during the preceding 12-month period (see Appendix, Table 1), and calculated the total retail selling price of that quantity of gasoline; they deducted the estimated cost and arrived at a tentative gross profit of $52,785.84. Next, plaintiffs determined that their gross profit from the sale of Goodrich gasoline during the 1966-1967 period was $35,484.76.[1] It was then assumed that plaintiffs' overhead expenses for the sale of Seaside gasoline would have been the same as they were for the sale of Goodrich gasoline, and they deducted

---

[1]This figure, if derived as plaintiffs indicate from the sum of their itemization of Goodrich regular margin—$18,650.91, Goodrich special margin—$10,571.78 and Goodrich ethyl margin—$6,082.07, should be $35,304.76.

the $35,484.76 from the $52,785.84, leaving plaintiffs with a profit loss of $17,301.08.

In the second step, plaintiffs estimated that if they had sold Seaside gasoline instead of Goodrich gasoline during the 1966-1967 period, they would have increased their business over the preceding year by 17.9 percent and, consequently, would have sold 122,342 more gallons than they sold during the preceding 12-month period; it was again assumed that plaintiffs' overhead expenses would have remained unchanged. Accordingly, there was assessed a further loss of $9,437.76, fixing the total loss of profits for the 1966-1967 period at $26,738.84. A recapitulation of this estimated loss follows:

| | | |
|---|---|---|
| Margin Seaside Based on 1965–1966 Gallons | $52,785.84 | |
| Less Actual Margin from Goodrich | 35,484.76 | |
| Loss | | $17,301.08 |
| Expected Margin from Increased Sales Seaside Regular | $ 5,757.30 | |
| Expected Margin from Increased Sales Seaside Special | 2,203.63 | |
| Expected Margin from Increased Sales Seaside Ethyl | 1,476.83 | |
| Additional Loss | | 9,437.76 |
| Total Net Loss | | $26,738.84 |

### 1967-1968

For the 12-month period from June 1, 1967, to May 31, 1968, plaintiffs projected into the future and predicted that they would have sold 950,056 gallons of Seaside gasoline, an increase in gallonage of 17.9 percent over the preceding period. After estimating the gross selling price and cost of that gallonage, the plaintiffs arrived at gross profit of $81,659.22. From this figure, they deducted $35,304.76, arriving at a prospective profit loss of $46,354.46; it was assumed that plaintiffs could have had a gross profit of $35,304.76 from the sale of Goodrich Rocket brand gasoline for the 1967-1968 period. It was also assumed that plain-

tiffs' overhead expenses for the 1967-1968 period would have been the same as they were for the preceding period. Plaintiffs' explanation of their calculations follows:

Gallon Sales Seaside Regular
1967–1968     588,275

588,275 x 8.5¢=Seaside
Regular Margin ................ $50,003.38

Less Goodrich Regular Margin....... 18,650.91

Net Loss on Regular........... $31,352.47

Gallon Sales Seaside Special
1967–1968    216,613

216,613 x 8.75¢=Seaside
Special Margin ................ $18,953.64

Less Goodrich Special Margin........ 10,571.78

Net Loss on Special........... $ 8,381.86

Gallons Sales Seaside Ethyl
1967–1968   .145,168

145,168 x 8.75¢=Seaside
Ethyl Margin ................. $12,702.20

Less Goodrich Ethyl Margin......... 6,028.07        (This figure
                                                    should be
                                                    6,082.07)

Net Loss on Ethyl............. $ 6,620.13

Total Net Loss ............. $46,354.46

### *1968-1969*

For the period commencing June 1, 1968, and ending May 31, 1969, the plaintiffs again increased the total gallonage of Seaside gasoline which

they would have sold for that period by 17.9 percent and predicted total sales of 1,120,116 gallons. Then, using the same factors as they used during the preceding 12-month periods, they arrived at a loss of $60,971.26. Plaintiffs' calculations for this period follow:

Gallon Sales Seaside Regular
   1968–1969    693,576

693,576 x 8.5¢=Seaside
   Regular Margin . . . . . . . . . . . . . . . $58,953.76
Less Goodrich Regular Margin . . . . . . .   18,650.91

       Net Loss on Regular . . . . . . . . . .            $40,302.85

Gallon Sales Seaside Special
   1968–1969   255,386

255,386 x 8.75¢=Seaside
   Special Margin . . . . . . . . . . . . . . . $22,346.28
Less Goodrich Special Margin . . . . . . .   10,571.78

       Net Loss on Special . . . . . . . . . . .            $11,774.50

Gallon Sales Seaside Ethyl
   1968–1969   171,154

171,154 x 8.75¢=Seaside
   Ethyl Margin . . . . . . . . . . . . . . . . . $14,975.98
Less Goodrich Ethyl Margin . . . . . . . . .    6,082.07

       Net Loss on Ethyl . . . . . . . . . . . . .           $ 8,893.91

       Total Net Loss . . . . . . . . . . . .           $60,971.26

### *1969-1970*

By using the 17.9 percent percentage of increase in plaintiffs' business if they had sold Seaside gasoline during the 1969-1970 period, plaintiffs predicted that they would have sold 1,320,617 gallons of gasoline during that period. From this gallonage, a gross profit of $113,509.68 was calculated. Then, plaintiffs again assumed that their overhead expenses would have remained the same as they were during the 1967-1968 period and that they would have had a gross profit of only $35,304.76 from the sale of

Goodrich gasoline; plaintiffs deducted $35,304.76 from the $113,509.68 and arrived at a loss of profits of $78,204.92. A recapitulation of plaintiffs' figures is as follows:

Gallon Sales Seaside Regular
   1969–1970    817,726

817,726 x 8.5¢=Seaside
   Regular Margin ............... $69,506.71

Less Goodrich Regular Margin....... 18,650.91

       Net Loss on Regular........... $50,855.80

Gallon Sales Seaside Special
   1969–1970   301,101

301,101 x 8.75¢=Seaside
   Special Margin ................ $26,346.34

Less Goodrich Special Margin ....... 10,571.78

       Net Loss on Special........... $15,774.56

Gallon Sales Seaside Ethyl
   1969–1970   201,790

201,790 x 8.75¢=Seaside
   Ethyl Margin ................. $17,656.63

Less Goodrich Ethyl Margin ........ 6,082.07

       Net Loss on Ethyl............. $11,574.56

       Total Net Loss ............. $78,204.92

■ From the foregoing computations it is evident that several unwarranted assumptions were made by the plaintiffs and accepted by the court; grossly erroneous conclusions resulted. First, the plaintiffs, apparently without comparing prevailing market conditions and similar factors, assumed that they would have sold as much Seaside gasoline during the 12-month period following the termination of the Seaside contract as they sold during the preceding 12-month period. However, plaintiffs sold greater quantities of gasoline when market conditions were depressed and when the retail selling price of the gasoline was cheaper (see Appendix, Table 1). Thus, because there were more depressed monthly periods

during the 1965-1966 year than there were during the 1966-1967 year, the drop in gallonage during the latter year, when the Kuffels were selling Goodrich gasoline, very well might have been explained by that factor. Then, to complicate matters further, the plaintiffs assumed that their overhead expenses for the 1966-1967 year would have remained the same as the preceding year even though they would have sold more gasoline in 1966-1967, and by this circuitous route, in actuality arrived at a loss based in part, at least, on gross profits instead of net profits. █ It is fundamental that in awarding damages for the loss of profits, net profits, not gross profits, are the proper measure of recovery (*West Coast Winery, Inc.* v. *Golden West Wineries, Inc.*, 69 Cal.App.2d 166 [158 P.2d 623]; *Olcese* v. *Davis*, 124 Cal.App.2d 58 [268 P.2d 175]). And this is particularly true in a case such as this where at the time of trial the actual overhead expenses for both years were known.

█ Second, the plaintiffs, in predicting the future growth of their gasoline business, ignored potential population and traffic changes, future road layouts and efficient business management, all of which are principal factors responsible for the growth of a retail gasoline business, and, instead, relied solely on the testimony of Mrs. Kuffel that she calculated the increases and the decreases in the sale of Seaside gasoline during the seven-year period immediately preceding the termination of the contract and determined that the annual average gain in plaintiffs' gasoline business for that period was 17.9 percent. Plaintiffs then applied this annual average gain, compounded, for the succeeding four years to determine the amount of gasoline they would have sold had they continued to sell Seaside gasoline for the unexpired term of the sales contract.

The fallacy of this approach is self-evident, and is violative of the cardinal rule that in fixing damages speculative profits are excluded (*Meyers* v. *Nolan*, 18 Cal.App.2d 319 [63 P.2d 1216]). According to the approach used by plaintiffs, their business would have increased at the rate of 17.9 percent per year compounded ad infinitum regardless of limitations imposed by potential population and traffic increases. In addition, by arbitrarily averaging their past gains, plaintiffs failed to take into consideration any unusual factors which might have caused an extraordinary gain in their business in previous years, and which could distort the average. For example, plaintiffs, unaccountably used a seven-year period instead of a four-year period to acquire the average; but, the major increase in their gasoline business occurred in the early part of that period, from June 1960 to May 1962, after plaintiffs improved their service station with the loan they procured in 1960 (see Appendix, Table 2); thereafter, plaintiffs' business increased by only 5,000 gallons during the succeeding 12-month period,

decreased the following 12-month period, and during the last two 12-month periods increased by some 50,000 and 89,000 gallons per period.

Third, while the plaintiffs assumed that if they had continued to sell Seaside gasoline for the unexpired four-year term of the Seaside contract, they would have increased their annual gasoline output from 683,473 gallons to 1,320,617 gallons, they also assumed that their annual output of Goodrich Rocket brand gasoline during the same period would have remained the same as it was for the 1966-1967 12-month period even though the two brands of gasoline are substantially equal in retail selling price and customer appeal. It is irresponsible to predict that plaintiffs would have more than doubled their gasoline business over the short span of four years if they sold Seaside gasoline but that their business would have remained static during the same period if they sold Goodrich Rocket brand gasoline, without evidence that Seaside gasoline is the superior gasoline with the greater public appeal. Plaintiffs offered no such evidence in this case.

Finally, in computing their loss of actual and prospective profits, plaintiffs assumed that they would have increased their gasoline business at the rate of 17.9 percent annually, without any increases whatsoever in overhead expenses. Plaintiffs apparently based this assumption solely on Lorren Kuffel's testimony that their overhead remained the same during the 1966-1967 period as it was during the 1965-1966 period. Plaintiffs' assumption that they could have almost doubled their gasoline output in four years and finally increased the retail sales by more than 50,000 gallons per month, without any increase in labor, maintenance, upkeep and supply costs, is patently unrealistic.

From the foregoing, it is clear that the part of the judgment fixing plaintiffs' general damages must be reversed. And, the exemplary damages must be redetermined as well. It is the rule that exemplary damages must bear a reasonable relation to actual damages. (*Brewer* v. *Second Baptist Church,* 32 Cal.2d 791, 802 [197 P.2d 713]; see *Foster* v. *Keating,* 120 Cal.App.2d 435, 455 [261 P.2d 529].)

Seaside attacks the court's findings in several particulars, contending in essence that the court, in each instance, varied the terms of the sales contract in violation of the parole evidence rule. However, Seaside's contentions as to these findings are concerned with the damages, and because the judgment as to this issue must be reversed, we shall consider Seaside's arguments only to the extent necessary to guide the trial court.

Seaside argues that even if it is assumed that plaintiffs were fraudulently induced to terminate the sales contract, the court could not

award damages for the full unexpired term of the contract because Seaside had the right to terminate at any time upon giving plaintiffs at least 15 days' prior written notice of its intention to do so. It suggests that upon retrial the court should limit plaintiffs' loss of profits, if any, to the 15-day termination period.

We do not agree. Although it is true that the sales contract contains a termination clause, it also provides that the term of the contract is for the 10-year period commencing on "the 1st day of June 1960, and ending on the 26th day of May 1970." Because Seaside, without explanation or notice of any kind, refused to sell gasoline to the plaintiffs immediately after the plaintiffs signed the termination agreements which Seaside prepared, it is reasonable to assume that Seaside relied solely on the termination agreements in refusing to sell the Kuffels gasoline after April 18, 1966. But, because the court found that the termination agreements were fraudulently procured, the Seaside sales contract was still in existence as of that date. Therefore, while arguably Seaside had the contractual right to terminate the sales contract, it simply did not elect to do so by giving the notice required by that contract. ■ It is axiomatic that the express term of a contract is not shortened or affected by a termination clause unless the termination clause is exercised in the manner prescribed by the contract.

■ In any event, when all of the instruments that the parties executed in 1960 are considered as a whole, and as part of one transaction, the sales contract is subject to the construction that it was not terminable by Seaside while the Seaside-Kuffel lease was in existence. The Seaside-Kuffel lease and the sales contract were signed on the same day and were an integral part of the security transaction between Kuffels, Seaside and the Crocker-Anglo Bank. Under the lease, the Kuffels were obligated to sell Seaside gasoline exclusively; yet, the lease was for a period of 10 years and contained no termination clause of any kind. Clearly, the Kuffels could not have intended to bind themselves to a 10-year lease in which they were unequivocally obligated to sell Seaside gasoline without some firm commitment on the part of Seaside to sell the gasoline to plaintiffs during the entire 10-year period. Consequently, when the sales contract is viewed in light of the Seaside-Kuffel lease and all other instruments which were signed at approximately the same time, the contract is reasonably susceptible to the interpretation that Seaside's right to terminate on giving plaintiffs 15 days' notice was intended to take effect only after the lease ceased to exist. ■ It is settled that " '[w]here two or more written instruments are executed contemporaneously, with reference to the other, for the purpose of attaining a preconceived object, they must all be construed together, and effect given if possible to the purpose intended to be accomplished.' " (*People* v. *Ganahl Lbr. Co.*, 10 Cal.2d 501, 507 [75 P.2d 1067].)

Next, Seaside points to paragraph four of the sales contract which provides that Seaside is not obligated to sell or deliver plaintiffs gasoline in excess of 20,000 gallons during any calendar month and asserts that the trial court must limit plaintiffs' loss of profits accordingly.

There is no merit to this contention. Paragraph four is a protective clause, obviously inserted in Seaside's sales contracts to protect the company against the risk of over-commitments of gasoline to its consumers during gasoline shortages and depressed market conditions. But, like Seaside's termination right, the clause was never exercised. Moreover, Seaside, is in the business of supplying gasoline for public consumption, and it is reasonable to surmise that if the contractual relationship between Seaside and plaintiffs had continued for the full term of the sales contract, Seaside would have furnished plaintiffs with gasoline to the full extent of plaintiffs' needs as long as it was profitable to do so. In fact, Seaside repeatedly exceeded the 20,000 per month limitation during the period from 1961 to 1966, and its past conduct in this respect is controlling. (*Crestview Cemetery Assn.* v. *Dieden,* 54 Cal.2d 744, 753 [8 Cal.Rptr. 427, 356 P.2d 171]; *Universal Sales Corp.* v. *Cal. etc. Mfg. Co.,* 20 Cal.2d 751, 761 [128 P.2d 665]; *Sacramento-Yolo Port Dist.* v. *Cargill of California, Inc.,* 4 Cal.App.3d 1004, 1011 [84 Cal.Rptr. 822].)

Lastly, Seaside maintains that the 2¢ per gallon allowance and the advantageous credit terms which it gave to plaintiffs in 1960 should not be considered in fixing plaintiffs' damages, because both the allowance and the credit terms could have been discontinued by Seaside at any time.

We are not persuaded by this argument. On April 9, 1960, on the same day that the Seaside-Kuffel lease was executed, Seaside by letter informed the Kuffels that ". . . this Company will allow you a special allowance of Two (2.0¢) Cents per gallon on each gallon of gasoline purchased by you from Seaside Oil Company in truck and/or trailer quantities during the term of said Service Station Lease for resale through said service station during each calendar month, such allowance to be applied to your rental or other account with this Company." Thereafter, the allowance was withheld by Seaside as a credit against the rent which it owed to plaintiffs on the Kuffel-Seaside lease; significantly, Seaside continued to pay the 2¢ per gallon allowance after plaintiffs refinanced their service station and after the parties agreed to discontinue making offsetting rental payments; from 1963 until May 18, 1966, Seaside paid the 2¢ allowance directly to the plaintiffs. Also, the credit arrangement which Seaside entered into with plaintiffs in 1960, with one minor revision, remained unchanged until 1966 when the sales contract was fraudulently terminated. Clearly, the court may and should be guided by the parties' past conduct in determining what would

have occurred in the future if the Seaside sales contract had not been fraudulently terminated. ██ While it is the rule in fixing damages that speculative profits are excluded, it is also the rule that damages need not be ascertained with absolute certainty.

The judgment is reversed as to the damages and the cause remanded for retrial as to that issue only; in all other respects, the judgment is affirmed.

Stone, P. J., concurred.

## APPENDIX

### Table 1

| | SEASIDE GASOLINE 1965–1966 | | GOODRICH GASOLINE 1966–1967 | |
|---|---|---|---|---|
| | Retail Price* | Volume | Retail Price* | Volume |
| June ......... | $ .289 | 57,036 | $ .259 | 75,464 |
| July ......... | .289 | 54,400 | .259 | 78,699 |
| August ....... | .289 | 58,390 | .259 | 75,450 |
| September .... | .282 | 68,937 | .259 | 82,594 |
| October ...... | .279 | 67,555 | .259 | 77,058 |
| November .... | .279 | 50,622 | .329 | 38,780 |
| December .... | .279 | 46,129 | .329 | 37,889 |
| January ...... | .279 | 37,103 | .329 | 35,029 |
| February ..... | .269 | 42,653 | .329 | 30,754 |
| March ....... | .269 | 52,585 | .329 | 46,277 |
| April ........ | .259 | 65,343 | .329 | 36,475 |
| May ......... | .259 | 82,720 | .329 | 40,155 |
| TOTALS ... | | 683,473 | | 654,624 |
| Monthly Average .... | | 56,956 | | 54,552 |

*Demonstrates market conditions.

### Table 2

#### Seaside Gasoline Sold for the Period from May 1, 1960 to May 18, 1966

|  | Gallons Sold | Gain or Loss |
|---|---|---|
| June 1959-May 1960 | 177,638 | |
| June 1960-May 1961 | 256,858 | + 79,220 |
| June 1961-May 1962 | 572,342 | + 315,484 |
| June 1962-May 1963 | 577,683 | + 5,341 |
| June 1963-May 1964 | 543,063 | — 34,620 |
| June 1964-May 1965 | 593,737 | + 50,674 |
| June 1965-May 1966 | 683,473 | + 89,736 |

**COAKLEY, J.**—I concur in the reversal and remand for new trial for the reasons that: (1) the trial court used the wrong measure for determining damages, viz., loss of profits based on gross rather than net profits, and (2) highly speculative and unrealistic projections of increased sales volume were used in fixing damages, i.e., in estimating probable sales of Seaside as against Goodrich products.

A petition for a rehearing was denied October 15, 1970, and respondents' petition for a hearing by the Supreme Court was denied November 10, 1970.