In re WIND MACHINE SALES AND SERVICE, INC., Debtor.

POWER HOUSE FORD ENGINES, INC., and Power House Equipment, Inc., Plaintiff,

v.

WIND MACHINE SALES AND SERVICE, INC., debtor and debtor in possession, United States of America (Internal Revenue Service), State of California (State Board of Equalization and Employment Development Department), Bank of the

Sierra, United States Small Business Administration, Gregg Industries, Inc., Erskin–Johns Company, J.M. Lift Trucks, Inc., Cooper–Weller Machine Shop, Inc., Paulis Vern Fought, and Dixie June Fought, Defendants.

Bankruptcy No. 93–11877–A–11F.
Adv. No. 93–1100.

United States Bankruptcy Court,
E.D. California.

Sept. 16, 1993.

Michael J. Noland, Kahn, Soares & Conway, Hanford, CA, Michael Terry Hertz, Lang, Richert & Patch, Fresno, CA, for Power House.

Hilton A. Ryder, McCormick, Barstow, Sheppard, Wayte & Carruth, Fresno, CA, for debtor.

Joseph Lewis Horswill, Soares, Rowson, Horswill & Mederos, Tulare, CA, for Paulis and Dixie Fought.

Diana P. Nowezki, Trial Atty., Tax Div., U.S. Dept. of Justice, Washington, DC, for IRS.

Jeffrey W. Eisinger, Sp. Asst. U.S. Atty., Small Business Admin., Fresno, CA, for SBA.

John B. Laing, Laing & Fox, Mission Hills, CA.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

RICHARD T. FORD, Bankruptcy Judge.

### INTRODUCTION

Power House Ford Engines, Inc. filed its Complaint to Determine Nature, Extent, and Validity of Liens and Interests in and to Personal Property; Complaint to Enjoin Use of Personal Property by Debtor in Possession, on May 14, 1993. Defendants, State of California (State Board of Equalization and Employment Development Department), Bank of the Sierra, Erskin–Johns Company, J.M. Lift Trucks, Inc., and Cooper–Weller Machine Shop, Inc. having not filed an answer and the default of these defendants having been entered at the preliminary hearing; and the plaintiffs, Power House Ford Engines, Inc. and Power House Equipment, Inc. (hereinafter referred to as "Power House"), having appeared by and through its attorneys Kahn, Soares & Conway by Michael J. Noland and the law firm of Lang, Richert & Patch by Michael T. Hertz, and the debtor, Wind Machine Sales and Service, Inc. (hereinafter "WMSS"), having appeared by and through its attorneys McCormick, Barstow, Sheppard, Wayte & Carruth by Hilton A. Ryder, Paulis Vern Fought and Dixie June Fought (hereinafter "Fought") having appeared by and through their attorneys Soares, Rowson, Horswill & Mederos by Joseph Lewis Horswill, the Internal Revenue Service (hereinafter "IRS") having appeared by Diana P. Nowezki, and the United States Small Business Administration (hereinafter "SBA") having appeared by Jeffrey W. Eisinger, Special Assistant U.S. Attorney, and Gregg Industries, Inc. (hereinafter "Gregg") having filed an answer but not having appeared at the trial; and the court having received both oral and documentary evidence and having considered the arguments and briefs of counsel; and good cause appearing, the court now makes the following Findings of Fact and Conclusions of Law.

### JURISDICTION

Jurisdiction exists pursuant to 28 U.S.C. § 1334. Venue is proper under 28 U.S.C. § 1409(a). The District Court has generally referred these matters to the Bankruptcy Court for hearing pursuant to 28 U.S.C. § 157(a) and United States District Court, Eastern District of California, General Orders 182 and 223. This is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2)(K) and (O). This is an adversary proceeding under Part VII of the Federal Rules of Bankruptcy Procedure (Rule 7001(2) and (7)).

### FINDINGS OF FACT—POWER HOUSE FORD

1. WMSS is a California corporation formed in 1984 by Mark A. Veteto, Sr. and Nancy Veteto, who own 100 percent of the outstanding stock. WMSS is primarily engaged in the manufacture, sales, and service of wind machines and other agriculture equipment including hedgers. The corporation has facilities in Lindsay, California, where it is headquartered, in the State of Washington, and in San Jacinto, California. (Reporter's Transcript ("RT") 547)

2. Prior to 1984, the business was owned and operated by Fought. The balance of the purchase price owed by WMSS to Fought is the sum of $272,083.24 secured by a lien upon the accounts receivable, inventory, and

equipment of WMSS. The security interest was perfected by the filing of a financing statement on February 15, 1990.

3. By November of 1990, the plaintiff had extended credit to the debtor in the approximate amount of $750,000 [RT 16, 23–25]. In an attempt to collateralize the debt, Power House required the debtor to execute a modification of an earlier security agreement. The collateral covered by the modification agreement included all of the debtor's "assets, including receivables generated from the sale of the engine systems ..." [PH–3]. On the same date, Power House also required the debtor to sign an Assignment of Purchase Contract and Security Agreements [PH–1]. The assignment was to only apply to the contracts from customers on an attached Exhibit "A". However, the Exhibit "A" was not admitted as evidence. Therefore, the contracts which were to be subject to the assignment are unknown to the Court. In conjunction with these two documents, the debtor executed a UCC–1 financing statement which was filed December 14, 1990. The filing described as collateral the debtor's cash, accounts, furniture, fixtures, equipment, inventory, and the proceeds thereof [PH–4].

4. As time went on, the debtor became increasingly dependent on Power House for its continued viability. By July of 1991, the plaintiff was supplying third-party inventory to the debtor (RT 104, 2–3). In January of 1992, the debtor notified Power House that it would only be able to repay its debt if Power House would purchase raw materials for the debtor (PH–16 and RT 68, 4–19).

5. In late 1991, Power House became aware that there were outstanding liens of the IRS recorded and that there were liens on inventory and receivables senior to that granted to Power House in November of 1990. (RT 22)

6. William Findley is the president of Power House. He has been a certified public accountant since August of 1957, and was an active CPA with a large firm for 25 years as an employee and partner (RT 12).

Community Bank provided working capital line of credit to Power House (RT 22). The bank would not allow the use of WMSS accounts receivable as collateral above 20 percent of all the outstanding receivables of Power House and, in addition, would not allow the entire balance due Power House by WMSS to be collateral if 20 or 25 percent of the total receivables due from WMSS became more than 90 days old (RT 23). In early 1992, Power House had to do something with the receivable from WMSS in the approximate amount of $300,000 to avoid losing a portion of its line of credit (RT 26).

7. WMSS did not have the credit available for a full production run for the manufacture of wind machines in the 1992 season. At about the same time, Debtor informed the Plaintiff that its suppliers would only sell to it on a C.O.D. basis. (RT 24, 7–24) Power House agreed to assist WMSS to insure a full production schedule by agreeing to purchase manufacturing inventory for WMSS from third party vendors. (RT 549) This put the Plaintiff in a difficult situation in that it realized that it "had to continue to sell product to them to enable them to raise the money to pay their older balance." (RT 27, 19–21)

8. It is the solution to this dilemma from which the major controversy in this case has its genesis. The plaintiff contends that from that point forward, it agreed with the debtor that the two parties could only do business in a general contractor/subcontractor relationship (RT 32, 6 to 33, 6). The debtor maintains that the parties merely continued their historical debtor/creditor relationship with the exception that the plaintiff was given the right to collect for itself the debtor's receivables (RT 558, 21 to 559, 12).

9. In approximately April of 1992, Power House began ordering gears from a third party vendor to be used in the manufacture of wind machines (RT 549). From April 1, 1992 through June 10, 1992, there was no significant business transacted between WMSS and Power House (RT 582). During this period, checks totaling $151,900 were paid by WMSS to Power House and checks totaling $143,074 were paid from Power House to WMSS (Exhibit WM–AH). These checks were simply exchanges of dollars. The invoices created for inventory in this

period sold by WMSS to Power House did not reflect the sale of actual inventory. These invoices were specifically created at the request of Mr. Findley to cover checks that were being exchanged (RT 582–83). For example, many of the invoices involve Avalon Fruit which contract had been paid in full before the invoices were even issued (Exhibit WM–AB and WM–AC; RT 586–88).

10. There were no invoices for specific material for the $143,000 paid from April 1, 1992 through June 10, 1992 (Cohen; RT 391–92).

11. On June 10, 1992, the parties executed two agreements. The agreements were prepared by the plaintiff's lawyer [RT 180, 14–16]. The first was an Agreement for Assignment of Receivables [PH–5]. In the preamble, the parties acknowledge that the debtor wishes to induce Power House "to continue to sell it engines *in accordance with past practices.* " (Emphasis supplied) The preamble goes on to state that Power House is willing to continue selling it engines if the debtor will in turn assign its receivables to Power House which are derived from the sale of its engines to the debtor's customers. The key provisions of the actual agreement are as follows (Emphasis supplied):

a.) Power House will *accept as payment* for engines which it sells to the debtor the *negotiable instruments* which the debtor receives from its customers.

b.) *Credit* given by Power House shall be conditional on payment by the customer of the debtor, and Power House shall have *full recourse* against the debtor for any negotiable instruments which are not timely paid.

c.) Power House may require the debtor to collect any negotiable instrument received from its customers. In such event, the debtor shall bear the full cost of collection and *shall not be entitled to reduce the amount due* Power House by such costs.

12. The second agreement executed on June 10, 1992 was a Marketing and Licensing Agreement [PH–6]. Again, the preamble states that the debtor wishes to induce the plaintiff "to continue to sell it engines *in accordance with past practices."* (Emphasis supplied) And again, the preamble goes on

to state that Power House is willing to continue selling engines to the debtor, but in this case, only if the debtor will designate the plaintiff as its exclusive distributor of wind machines, and allow it to use the debtor's name. The key provisions of this agreement are as follows (Emphasis supplied):

a.) Power House will be the exclusive distributor for the debtor's wind machines and the debtor will not sell to anyone else.

b.) The plaintiff may do business under the name "Wind Machine Sales & Service."

c.) Power House shall have authority to establish pricing policies for the *product which it purchases* from the debtor *for resale,* as well as for services of the debtor's employees for which Power House obtains repair or other work.

13. The Court finds that these two agreements are mutually exclusive. The former clearly states that the debtor will assign all receivables generated from the sale of the plaintiff's engines to the plaintiff. The later just as clearly states that the debtor will not sell to anyone but the plaintiff, thereby precluding the possibility of generating receivables from any third party.

14. From July 1, 1992, through September 14, 1992, WMSS paid to Power House the sum of $268,000 (WM–AH). During the same period, Power House paid to WMSS the sum of $280,000 (WM–AH). This procedure resulted in trading dollars that reduced the outstanding accounts receivable as shown on the books of Power House to zero by September of 1992. (RT 556)

15. There was no business transacted between the parties during this period of time of any consequence other than the exchanging of the checks identified as purchases of service invoices or advances on invoices for future wind machine manufacture (RT 556). During that period of time, Power House used its credit to order materials for the manufacture of wind machines from third party vendors and supplied power units to WMSS. The net result of the business transaction between the parties from April 1, 1992 through September 14, 1992, was that the obligation from WMSS to Power House remained at approximately $300,000, but in-

stead of being characterized as an account receivable from WMSS the obligation was now characterized as advances for the purchase of service contracts, for the purchase of inventory of WMSS by Power House that was never identified, or as cash advanced for the manufacture of wind machines.

16. The parties developed a formula as to how the profits generated from sales of wind machines would be shared. For each contract to sell a wind machine, Power House was to pay the sales tax and recover the cost of the inventory it supplied, plus a gross profit of 1.5% of the contract amount. The remainder would be remitted to or retained by the debtor [RT 49, 15 to 50, 2]. However, the parties chose not to be diligent in seeing that each party received the specific amount it would have been entitled to under the formula for each contract. Power House felt it acceptable for the debtor to retain an overpayment on a specific contract because those funds would be available for the production costs of other contracts [RT 55, 22 to 56, 1]. Furthermore, the debtor felt that there was some flexibility as to which contracts and receivables would be assigned to the plaintiff. The debtor's bookkeeper has testified that the volume of receivables assigned to Power House each month fluctuated according to how many Mr. Findley wanted at a particular time and that Mr. Veteto would choose not to assign a particular contract for one reason or another, usually having to do with a long-time customer relationship [RT 810, 25 to 813, 8].

17. Similarly, there were certain categories of work which the debtor was apparently free to continue without assigning the subsequent receivables to the plaintiff. The plaintiff was aware of the debtor's maintenance and service contracts with respect to fleets of machines which were already in place with growers and acknowledged that its "arrangement" with the debtor was not intended to interrupt into those relationships [RT 202, 16–23].

18. The agreement giving the plaintiff the right to conduct business under the debtor's name was executed in June of 1992. However, Power House filed a Fictitious Business Name Statement in Orange County which states that it started doing business under the name Wind Machine Sales & Service on January 2, 1992 [PH–40 and RT 255, 8 to 256, 24]. The statement was not filed until September 28, 1992. California Business and Professions Code Section 17910 states that "Every person who regularly transacts business in this state for profit under a fictitious business name shall: (a) File a fictitious business name statement ... not later than 40 days from the time he commences to transact such business ..."

19. The Agreement for Assignment of Receivables states that the debtor was to submit a promissory note or other negotiable instrument to the plaintiff for review. However, this was never done [RT 160, 12–14]. In fact, the plaintiff had very little insight into what procedures the debtor followed to ascertain whether its customers were even credit-worthy in the first place [RT 268, 11–18].

20. The contracts were all part of a pool with no specific payments to either Power House or WMSS for specific contracts (RT 55–56).

21. Power House actually advanced funds to allow WMSS to carry on its business before contracts were completed on the expectation that the manufacturing contracts would be accomplished throughout the season (RT 59).

22. Exhibit PH–8 contains several executed Purchase Contract and Security Agreement forms. Each form states that the "Prices and terms set forth herein are subject to change ..." However, the president of Power House had no idea as to how, when, or why the prices and terms would be subject to modification [RT 196, 20 to 197, 21]. Additionally, each form indicates that the seller is the debtor, and not the plaintiff doing business as Wind Machine Sales.

23. Knowing that the debtor was engaged in activities outside the scope of its "arrangement" with the plaintiff, Power House provided the debtor with cash, and inventory from either itself or third parties, with little control over how these resources were allocated [RT 105, 1–14 and 158, 1 to 159, 10]. In fact, a substantial portion of the cash

being supplied by the plaintiff was being used for the debtor's general payroll [RT 871, 9–23]. The plaintiff's accountant was obliged to conclude that the debtor could have used the cash for paying people who worked on something totally apart from the "arrangement" [RT 970, 18–25].

24. The "build" sheet for each manufactured wind machine prepared by Jim Combs and provided to Power House listed all the parts that went into the machine. Only those supplied by Power House were shown with a value. The balance of the parts was supplied by WMSS. (Combs; RT 496–97)

25. "Build" sheets were not prepared for service or repair work, but only for wind machine manufacturing (Combs; RT 500).

26. Not surprisingly, by December of 1992, even the vice-president of the plaintiff, Harlan Spain, was confused about the logistics of the arrangement between the parties. In a letter to the debtor, he states that Power House needs "to relieve our inventory, and obviously bill WMSS for the cost of the material since we purchased it." [PH–18] He also testified that the plaintiff would "purchase labor" from the debtor, but would never receive an invoice for it [RT 296, 1–5].

27. Harlan Spain and Bea of Power House requested that Jacques Cohen reconcile the inventory on hand as of January 31, 1993 to what Power House showed as inventory on its books which was not accounted for in production of new wind machines in the amount of $82,947.62 (WM–U; RT 501). Some items shown in the list were not in stock, but these items were minor compared to the over all value of $80,000, which was the actual inventory purchased by Power House from third party vendors in the possession of WMSS on January 31, 1993 (RT 503).

28. Beginning after June 10, 1992, Laurie Johnson, the bookkeeper at WMSS, was given about 108 initial invoices to be assigned to Power House. This was not all the invoices for the month. She calculated the amount due from Power House as a result of the assignment of the invoices by subtracting a fee of two and a half percent and the sales tax. This amount was shown as a receivable from Power House. (RT 805–06)

29. A copy of the invoice was sent along with a box of envelopes to send them out in. Of the initial 106 invoices, two were for wind machines and the balance were for service contracts. (RT 806)

30. Power House was unable to properly bill the assigned invoices. The procedure was too confusing. As a result, Laurie Johnson established Module III as a separate account receivable accounting system as an accommodation to Power House. Module III was not tied to the accounting system of WMSS. The assigned contracts were numbered beginning with the number 5001. (RT 808–09)

31. Sums due on Module III from Power House were shown as receivables on Module I. Checks received from customers would be photocopied, entered into Module III, and forwarded to Power House. (RT 810)

32. One-third of the service contracts in June, July, August, and September of 1992 were retained by WMSS. In October, slightly more than half of the service invoices were retained by WMSS. In November and December, approximately one-third were retained by WMSS. In December 1992 through filing the chapter 11 petition, approximately one-half were retained by WMSS. (RT 811–12)

33. From June of 1992 through the filing of the chapter 11, approximately 10 to 12 contracts for the manufacture of wind machines were not assigned to Power House out of 101 contracts (RT 812–13).

34. Power House billed WMSS for gears, bearings, and seals in January of 1993 which items had been left over after usage in the production program (Doris Newman; RT 904). This action is totally inconsistent with WMSS being a subcontractor of Power House on all contracts after June 10, 1992.

35. Invoices of WMSS forwarded to Power House for assignment were sometimes actually assigned and sometimes not (RT 595). Assignments were prepared by Power House and forwarded to WMSS for signature. Many assignments were never actually signed by a representative of WMSS (see Exhibit WM–Z).

36. WMSS never supplied Power House with any information for inventory used on service work. The only information provided was on inventory of Power House used in new machines (RT 112–13). Without this critical information, it was impossible to identify the service contracts that used Power House inventory or what portion of any given service contract should be paid to Power House for its inventory. All service contracts that were assigned to Power House were for collateral only for advances made by Power House on the contract as part of the pool concept.

37. Power House invoiced WMSS for materials used on service contracts (WM–F). These invoices were for materials not used in the manufacturing of wind machines, but instead were used on the service contracts or otherwise used by WMSS. (RT 113–16) Service contracts were assigned for collateral only. This action was inconsistent with a contractor/subcontractor relationship.

38. The third party vendor inventory pledged to Community Bank by Power House on January 31, 1993, was the sum of $82,947.62 (WM–T). This inventory corresponds to a listing of the physical inventory faxed WMSS in early February 1993 in an effort to reconcile Power House inventory in the possession of WMSS. (WM–U)

39. The amount of third party inventory reported to Community Bank as collateral for the Power House line of credit on December 31, 1992, was the sum of $145,501.40 (RT 126) (WM–5). The $500,000 inventory number referred to in the letter agreement of March 11, 1993 (PH–7), represented the approximate outstanding obligation of WMSS to Power House on December 31, 1992, and not the physical inventory.

40. At the request of William Findley, WMSS gave signed, blank counter checks to Power House in September of 1992. Power House filled in its invoice number as a check number and showed the name of the person paying as an account debtor of WMSS. (PH–27; Findley; RT 136–39)

41. Power House did not have an assignment of an invoice for each and every wind machine built during the period from June 10, 1992 through the filing of the chapter 11 (RT 146). The assignments were received after the machines were built (RT 147).

42. At the March 11, 1993 meeting that resulted in a letter agreement (PH–7), WMSS would not have received a check from Power House for payroll had a letter not been signed (Dambley; RT 309).

43. Power House did not present any evidence showing which contracts were assigned and which contracts were not assigned, instead relying on the argument that all contracts were assigned pursuant to the June 10, 1992 documents.

44. The relationship between Power House and WMSS remained as debtor/creditor notwithstanding that Power House used a dba of Wind Machine Sales and Service to negotiate checks and paid sales tax only on sums collected by Power House.

45. The balance due Power House from WMSS is the sum of $634,078.59. This sum is calculated based on the beginning balance shown in WMSS Exhibit WM–H with the credits and debits as set forth in Exhibit WM–I through WM–R.

46. This sum is secured by a lien on the inventory, receivables, furniture and equipment of WMSS.

47. The calculation of the Power House ownership in cash, accounts receivable, work in process and inventory in the possession of WMSS set forth in PH–29, Exhibit 1, in the amount of $915,924 is flawed for two reasons. The first is that the exhibit assumes that all sales of WMSS were for the benefit of Power House in the amount of $2,366,198. If this is not the case, the analysis is incorrect (Cohen; RT 380). Not all sales involved Power House inventory. On Schedule 1 of PH–29, the sum is set forth as $126,035. This number was not in any way calculated but is simply a "plugged number" that is necessary to reconcile Schedule 1 which is based on total sales of WMSS and Schedule 2 which is purportedly a total of the advances and inventory supplied by Power House less the payments to Power House. Neither Schedule 1 nor Schedule 2 prove the value of assets in possession of WMSS belonging to Power House nor do they constitute a tracing of any

such assets. The first time the number of $915,924 was calculated was on Exhibit 2 and was used throughout Mr. Cohen's documents (RT 383).

48. There was no evidence as to the valuation of the trucks, equipment, the note receivable from Veteto to the Debtor, or the machinery and office equipment.

### CONCLUSIONS OF LAW— POWER HOUSE FORD

The Court finds that the plaintiff has not met its burden of proof in trying to establish an ownership interest in any of the property currently in the debtor's possession. The preponderance of the evidence does not support the contention that the plaintiff and the debtor were operating in a general contractor/subcontractor relationship since June of 1992.

First of all, neither the Agreement for Assignment of Receivables nor the Marketing and License Agreement even mention the words general contractor or subcontractor. In fact, a careful reading of the two agreements leads inexorably to the conclusion that this was but another, albeit more encompassing, progression of the debtor/creditor relationship which had existed between these parties for almost ten years. Both of the agreements speak of the parties' mutual desire that Power House continue to sell engines to the debtor in accordance with their past practice. The negotiable instruments given by the debtor's customers were to be transferred to the plaintiff as payment for engines. But, Power House retained recourse against the debtor if any of the instruments were not timely paid. Further, if Power House required the debtor to collect the instruments, the debtor would not be able to reduce the amount it owed Power House by any collection costs.

California Civil Code Section 1654 states that, "In cases of uncertainty ... the language of a contract should be interpreted most strongly against the party who caused the uncertainty to exist." The two agreements, prepared by the plaintiff's counsel, cast an uncertain picture of the relationship of the parties. Pursuant to Section 1654, this uncertainty should not be resolved in favor of the plaintiff, to the detriment of either the debtor or the other defendants in this proceeding. The conflicts and ambiguities in the two agreements executed on June 10, 1992 leave this Court without sufficient support to conclude that the intent expressed therein was that the debtor would operate as the subcontractor of the plaintiff in the production and marketing of wind machines.

Given the deficiencies in the written agreements between the debtor and the plaintiff, the Court finds that it is appropriate to examine the conduct of the parties. As the Supreme Court of California stated in the case of *Crestview Cemetery v. Dieden,* (1960) 54 Cal.2d 744, 752–53, 356 P.2d 171, 8 Cal. Rptr. 427:

> That the actions of the parties should be used as a reliable means of interpreting an ambiguous contract is, of course, well settled in our law.

In looking at the actions of the parties since June of 1992, the Court again finds lacking the preponderance of evidence necessary to conclude that there was a meeting of the minds between the debtor and Power House whereby the parties agreed that the debtor would become a subcontractor of the plaintiff. Instead, the course of conduct of both parties simply indicates that Power House continued to extend cash and materials to the debtor in exchange for assignments of the debtor's contracts and receivables with its customers. The only significant difference after June of 1992 was that Power House could negotiate the checks remitted by the debtor's customers directly by virtue of its license to masquerade as "Wind Machine Sales & Service", thereby avoiding the bounced checks previously submitted by the debtor as payment on its account.

Had Power House genuinely viewed itself as the prime contractor in this relationship, rather than as a creditor, the Court believes that it would have been more concerned about the form of the agreements executed by the buyers of wind machines, the creditworthiness of those buyers, the actual use of the resources made available to the debtor, and the manufacturing activities of the debtor. Instead, Power House seemed singularly

focused on one thing: eliminating its financial investment in the debtor.

Having determined that the plaintiff did not substantiate its claim of ownership, and having found that the facts do not warrant equitable subordination, the remaining issue is the plaintiff's assertion of a security interest in the debtor's assets and the extent thereof.

■ The Court finds that, based on the Modification of Security Agreement and Guaranty, and the UCC–1 financing statement filed December 14, 1990, Power House has a perfected security interest in the accounts, furniture, equipment, and inventory of the debtor. As with the SBA and the Foughts, the security interest of Power House is subordinate to the lien of the IRS in the debtor's accounts and inventory. Furthermore, Power House's blanket lien is junior to that of both the SBA and the Foughts since it is subsequent in time. The Court finds that the amount of the plaintiff's claim, based on cash and property extended to the debtor, is in the amount of $634,078.59 as of the petition date.

*The Claims of the State of California, Gregg Industries, Erskin–Johns Company, J.M. Lift Trucks, and Cooper–Weller Machine Shop*

These parties either did not file an answer and/or did not appear for the trial of this matter. In the absence of their participation, the plaintiff did not submit sufficient evidence to enable the Court to determine the nature, extent, or validity of the interests of these parties. Accordingly, the Court declines to do so.

## FINDINGS OF FACT—INTERNAL REVENUE SERVICE

On May 10, 1993 the Internal Revenue Service ("IRS") filed a proof of claim which sets forth a secured claim of $389,615.68 (Ex. IRS–A). The assessment dates for the secured employment tax liabilities range from September 16, 1991 to January 4, 1992. (Ex. IRS–E). Notices of Federal Tax Liens for these liabilities were recorded with the Secretary of State of December 19, 1991, March 31, 1992, and January 19, 1993. (Ex. IRS–B through IRS–D)

## CONCLUSIONS OF LAW—INTERNAL REVENUE SERVICE

■ 1. Under 26 U.S.C. Sections 6321 and 6322, the federal tax lien attaches to all rights to a delinquent taxpayer's property as of the assessment date. State law determines a taxpayer's property rights. *Acquilino v. United States,* 363 U.S. 509, 80 S.Ct. 1277, 4 L.Ed.2d 1365 (1960). The debtor's accounts, inventory, equipment and cash would be included within "rights to property" subject to the federal tax lien upon assessment. *United States v. National Bank of Commerce,* 472 U.S. 713, 720, 105 S.Ct. 2919, 2924, 86 L.Ed.2d 565 (1985) (Section 6321 is broadly construed to reach 'every interest in property that a taxpayer may have'). Thus, the federal tax lien attaches to, and is secured by, all of the debtor's pre-petition property.

■ 2. While state law determines the nature of property rights, federal law determines issues of priorities in relation to competing claims. *United States v. Acri,* 348 U.S. 211, 75 S.Ct. 239, 99 L.Ed. 264 (1955). The general rule of priority is first in time, first in right. *United·States v. City of New Britain,* 347 U.S. 81, 85, 74 S.Ct. 367, 370, 98 L.Ed. 520 (1954) (citing, *Rankin v. Scott,* 25 U.S. (1 Wheat.) 177, 6 L.Ed. 592 (1827)).

■ 3. A competing lien which antedates a federal tax lien must be "choate" in order to have priority over the tax lien. To be choate, a lien must be certain as to amount, the identity of the lienor must be established, and the property subject to the lien must be established before the federal tax lien attaches. *City of New Britain,* 347 U.S. at 81, 74 S.Ct. at 367.

■ 4. Although the federal tax lien is generally effective against all persons even in the absence of recordation, certain classes of creditors are protected against unrecorded tax liens. *Don King Productions, Inc. v. Thomas,* 945 F.2d 529, 533 (2nd Cir.1991) [*citing, Rice Investment Co. v. United States,* 625 F.2d 565, 568 (5th Cir.1980) ]. One such

creditor is a "secured creditor." 26 U.S.C. Section 6323(a).

5. Section 6323(a) provides that "[t]he lien imposed by [S]ection 6321 shall not be valid as against any purchaser, *holder of a security interest,* mechanic's lienor, or judgment lien creditor until notice thereof which meets the requirement of subsection (f) has been filed by the Secretary." 26 U.S.C. Section 6323(a).

■ 6. The SBA's and the Foughts' security interests secured by existing WMSS's accounts, inventory, equipment and proceeds thereof were perfected under California law upon their respective filing of their UCC–1 financing statements on September 4, 1985 and February 15, 1990. *See,* Cal.Com.Code Sections 9203; 9302. Since both creditors perfected their security interests prior to the time any of the United States' liens arose or were recorded, they would enjoy priority over those liens as to any of the debtor's property that was acquired by the debtor prior to the time that the federal Notices of Federal Tax lien were filed.

7. The security agreements supporting both the SBA's and the Foughts' UCC–1 financial statements provided that the obligations covered by those security agreements were to be secured by after-acquired collateral (again, accounts, inventory, equipment and proceeds thereof). *See,* Cal.Com. Code Section 9204. Without an after-acquired property clause, the collateral afforded them by their security agreements would have been limited to collateral that the debtor had rights to at the time the security interest first attached. Cal.Com.Code Section 9203(1)(c).

■ 8. The filing of the federal Notices affected the priorities of both creditors, however, with regard to any property the debtor acquired after those federal Notices were filed. This is true because the security interest of a competing creditor will enjoy priority over the federal tax lien only to the extent that the specific collateral was *in existence* at the time of the filing of the Notice of Federal Tax Lien. 26 U.S.C. Sections 6323(a); 6323(h)(1) (defines 'security interest' as an interest in existing property acquired by con-

tract (oral or written) to secure payment or performance of an obligation, for which the holder has parted with money or money's worth and which would enjoy priority over a subsequent judgment lien creditor under local law).

■ 9. Once the federal Notice is filed, the United States is entitled to priority to property acquired thereafter by the debtor as against competing lienors whose liens attach upon the debtor's acquisition of such property. *United States v. McDermott,* —— U.S. ——, 113 S.Ct. 1526, 123 L.Ed.2d 128 (1993).

■ 10. This is especially important in the instant case, where a variety of competing "floating liens" attach to collateral such as inventory and accounts receivables which turn over rapidly. Such liens can only be "choate," or attach to such collateral, so long as the debtor maintains possession of the collateral. With respect to future accounts receivable being used as collateral, that collateral is not in the debtor's possession, or in **existence,** until services have been rendered giving rise to that account. *Gold Coast Leasing Co. v. California Carrots,* 93 Cal.App.3d 274, 155 Cal.Rptr. 511 (1979); 26 U.S.C. Section 6323(h)(1). Thus, if services are yet to be rendered, there is no collateral to which any of these liens may attach.

11. Thus, the security interests of the SBA and the Fought's are superior to the federal tax liens of the United States with respect to property the debtor acquired prior to the filing of any of the Notices of Federal Tax Lien. However, the liens of the United States would prime those of the SBA and the Foughts as to any property that the debtor acquired **after** the filing of any of those same federal Notices.

■ 12. PHE's alleged security interest in this suit deals with property that came into existence under the program, or after June 10, 1992. Since this date occurred after the first two Notices of Federal Tax Lien were recorded, *McDermott, supra,* is controlling and the United States would be entitled to priority against PHE over any such property. Thus, in order for PHE to prevail at

all in this action, it would have to prevail on its ownership claim. PHE has not done this.

*FINDINGS OF FACT—SMALL BUSI-
NESS ADMINISTRATION*

1. The Bank of the Sierra loaned $600,-000 to the debtor on or about August 28, 1985, as is reflected by the promissory note marked as SBA–A. The note indicates that it was assigned to the Small Business Administration ("SBA") on April 22, 1993.

2. As collateral for the note, the lender required the debtor to execute a security agreement [SBA–B]. Pursuant to the agreement, the bank took a security interest in accounts receivable, inventory, intangibles, work in process, equipment, and furniture, whether owned at that time or thereafter acquired, and the proceeds thereof.

3. The bank perfected its security interest by filing a UCC–1 financing statement on September 4, 1985 [SBA–C].

4. A UCC–2 continuation statement was also filed on March 26, 1990 [SBA–D].

5. On the same date the note was assigned to the SBA, the bank executed a UCC–2 assignment, thereby transferring its interest to the SBA [SBA–E].

6. Although the SBA has not yet filed a claim, it has submitted evidence that on July 23, 1993, its loan balance was $138,875.75, with daily interest accruing thereafter in the amount of $29.69 per day [SBA–F].

7. There was no evidence offered that SBA checked on their collateral at any time.

8. There was no evidence that the Debtor was delinquent on its payments to SBA before the loan became all due.

9. There was no testimony at all by anyone as to the valuation of the trucks, equipment, the note receivable from Veteto to the Debtor, or the machinery and office equipment.

*CONCLUSIONS OF LAW—SMALL
BUSINESS ADMINISTRATION*

 The SBA holds the senior blanket encumbrance on the assets of the debtor, including equipment, furniture, accounts, inventory, intangibles, and the proceeds there-of, up to the amount of its loan balance. The SBA's security interest is junior only to that of the IRS in the inventory, accounts, and cash proceeds therefrom.

*FINDINGS OF FACT—PAUL
AND DIXIE FOUGHT*

1. The debtor executed a promissory note in the amount of $300,000 in favor of the Foughts on July 1, 1984 [PF–B].

2. As collateral for the note, the debtor executed a security agreement pursuant to which the Foughts took a security interest in the furniture, fixtures, equipment, motor vehicles, inventory, accounts receivable, documents, and rights to insurance, whether then existing or thereafter acquired, and the proceeds therefrom [PF–C].

3. The Foughts caused a UCC–1 to be filed on February 15, 1990.

4. There was no evidence offered that Foughts checked on their collateral.

5. Foughts testified that he received his payments substantially on time.

6. There was no testimony at all by anyone as to the valuation of the trucks, equipment, the note receivable from Veteto to Debtor, or the machinery and office equipment.

*CONCLUSIONS OF LAW—PAULIS
AND DIXIE FOUGHT*

 The Foughts have a blanket lien on the assets of the debtor, including equipment, furniture, inventory, accounts, documents, and the proceeds therefrom up to the value of their claim. The records on file in this case reveal that the Foughts filed a proof of claim dated May 14, 1993 in the amount of $272,083.24. No contrary evidence was submitted by any of the other parties. The evidence does not reflect that the Foughts obtained pink slips for any of the debtor's vehicles. Therefore, they do not have a perfected interest in any such vehicles that the debtor may have. Their blanket lien is junior to that of the SBA since it is later in time.

The Court has considered the argument of the Foughts as to the priority claimed by the IRS in property acquired subsequent to December 13, 1991 by the debtor. Specifically, the Foughts argue that the filing of the tax lien by the IRS afforded them no actual notice that from that point forward their security interest was being progressively eroded as the debtor generated new accounts receivable and replenished its inventory. The Court does not find their argument persuasive. The statutory language relied upon by the IRS is clear. Accordingly, as with the SBA, the Foughts' interest is further subordinated to that of the IRS as to the debtor's inventory, accounts, and proceeds thereof.

## DECISION

1. With regard to any personal property the Debtor still possesses that was acquired prior to the dates that Notices of Federal Tax Liens were recorded, SBA has first priority to secure $138,875 plus interest from July 23, 1993; the Foughts have second priority to secure $272,083 plus interest as of May 14, 1993; Power House Ford would have third priority in the sum of $634,078 plus interest; and the United States would have fourth priority and is owed the sum of $389,615 as of May 10, 1993 plus interest.

2. As to property in possession of the Debtor and acquired after December 19, 1991, IRS has the senior lien pursuant to U.S.C. Section 6323(a), Small Business Administration has a second priority after IRS, and the Foughts have a third priority after IRS and the SBA. Power House Ford then follows with a fourth priority.

3. The Court declines to fix a priority or amount of debt owing to the State of California, Gregg Industries, Erskin–Johns Company, J.M. Lift Trucks, and Cooper–Weller Machine Shop, as they failed to either file an answer to the proceedings or failed to appear and offer any evidence of the nature, extent, or validity of their interests.

4. The amount of inventory, whatever that is, remaining in Module 4 as set forth in Exhibit PH–26, is the property of Power House Ford.

5. The restraining order previously entered prohibiting WMSS from using inventory or collecting accounts receivable is vacated.

6. All inventory used by WMSS that existed at the time of the filing of the case shall be treated as cash collateral for the cost value which shall be held in an interest-bearing, blocked account until further order of this Court. All pre-petition accounts receivable collected by WMSS shall constitute cash collateral and shall be held in an interest-bearing, blocked account, except for sums previously authorized to be used, until further order of the Court.