Filed 6/5/13  DepsiTech v. Bekins A-1 Movers CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA


| | |
|---|---|
| DEPOSITECH, INC., <br><br> Plaintiff and Appellant, <br><br> v. <br><br> BEKINS A-1 MOVERS, INC., et al., <br><br> Defendants and Appellants. | D061729 <br><br><br> (Super. Ct. No. <br> 37-2010-00099414-CU-BC-CTL) |

APPEALS from a judgment and order of the Superior Court of San Diego County, Frederic L. Link, Judge.  Affirmed.

Horvitz & Levy, Peter Abrahams, Steven S. Fleischman; Higgs, Fletcher & Mack, Peter S. Doody and Loren G. Freestone for Defendants and Appellants.

Murtaugh Meyer Nelson & Treglia, Robert T. Lemen, Lawrence J. DiPinto and Larissa L. Abruscato for Plaintiff and Appellant.

Defendant Bekins A-1 Movers, Inc. (Bekins) appeals a judgment in the action filed against it by plaintiff DeposiTech, Inc. (DeposiTech) for breach of contract, negligence, and fraud arising out of damage to DeposiTech's property that occurred while

Bekins moved it from one to another storage facility. On appeal, Bekins contends: (1) the trial court erred by allowing DeposiTech to present evidence, and instructing the jury, on loss of a business opportunity as compensatory damages for Bekins's fraud; (2) the evidence is insufficient to support the jury's award of $550,000 in damages for DeposiTech's lost business opportunity; and (3) because the jury's compensatory damages award must be reduced, its punitive damages award must likewise be reduced or at least retried.

DeposiTech cross-appeals, challenging the trial court's order denying its motion for an award of attorney fees. It contends that, as the prevailing party, it is entitled to Civil Code[1] section 1717 attorney fees pursuant to an attorney fees provision in its storage contract with Bekins.

FACTUAL AND PROCEDURAL BACKGROUND

DeposiTech develops and markets plasma-based equipment and technologies. In 1997, it constructed a prototype (Prototype) of a machine called the "PlasmaPlate" that uses plasma ions to deposit ultra-fine and precise copper conductor lines on printed circuit boards. However, because it was unable to obtain sufficient financing at that time, DeposiTech could not proceed to the second stage of development, involving refinement of the Prototype to produce actual printed circuit board samples for customers and the development of a production model of the PlasmaPlate.

---

[1] All statutory references are to the Civil Code except as otherwise specified.

In 1999 DeposiTech contracted with Cole Moving & Storage Co. (Cole) to store the Prototype in its San Diego warehouse on Sorrento Valley Road until DeposiTech could attract new investors. The Prototype weighed about 6,000 pounds, was about seven feet high and eight feet long, and consisted of three chambers. Dr. Daryl Doane, DeposiTech's president, explained to Cole's supervisor that the Prototype was top-heavy and fragile, and had to be moved with great care. Cole assured her that the Prototype would be safely stored in its warehouse until it was ready to be removed. On October 5, 1999, she signed a document titled "Non-negotiable Warehouse Receipt and Contract" (Contract) that listed the items of DeposiTech's property, including the Prototype, that Cole transported to its warehouse.

In April 2004, Cole sold its storage contracts and assets to Bekins. Bekins sent a letter to Cole's customers, stating: "Rest assured your possessions will continue to be secured, in a safe, climate-controlled environment. Aside from a new remittance payee, this should be a seamless transition for each of you."

In November 2004, Bekins closed the San Diego warehouse and moved the property stored there, including the Prototype, to a Poway facility. During the move, Bekins damaged the Prototype. However, Bekins did not give DeposiTech advance notice of the move and did not inform it of the damage to the Prototype. Instead, Bekins sent DeposiTech a letter dated November 10, 2004, informing it that "your goods are safely relocated" to the Poway facility. It is unclear whether that letter was sent to DeposiTech before or after Bekins moved and damaged the Prototype.

3

In May 2006, Bekins moved the property at its Poway facility, including the Prototype, to a storage facility on World Trade Drive in San Diego, at which the Prototype was then stored in a trailer. After each move, Bekins continued to bill DeposiTech for monthly storage fees, which it paid each month.

In 2008, Sierra Proto Express (Sierra), a large printed circuit board manufacturing company, expressed interest in the Prototype. Robert Tarzwell, its then director of technology, had been searching for an alternative to the traditional chemical processes and minaturizing copper conductor lines on printed circuit boards. Tarzwell was convinced the PlasmaPlate technology was "real." On March 20, 2008, Sierra and DeposiTech entered into an agreement (Sierra Agreement) providing that Sierra would take possession of and expend considerable resources in developing the Prototype at its own expense, but DeposiTech would retain ownership of the Prototype and all patents and other intellectual property rights related to it. Sierra needed DeposiTech's technology and DeposiTech needed Sierra's resources and development expertise. The Sierra Agreement provided:

> "DeposiTech agrees to ship its [P]rototype equipment in good shape from its present storage location near San Diego to [Sierra's] location in Sunnyvale in March 2008, using a carrier recommended by Sierra. DeposiTech shall own and retain title to said equipment while at Sierra, but DeposiTech agrees to allow any reasonable additions and modifications aimed at improving its performance. . . .

> "Sierra agrees to spend significant effort in developing this equipment at its own expense. DeposiTech shall not be liable for any expenses, including operating expenses, insurance, costs of permits, or taxes while its equipment is at Sierra's facility. . . .

4

"If improvements, modifications or engineering changes are made during the course of this equipment development that are deemed patentable by both Sierra and DeposiTech, then all rights to such patents will be assigned to DeposiTech. DeposiTech will pursue timely legal action to apply for such patents. . . .

"If after March 2009 Sierra is no longer actively pursuing efforts to develop or use this equipment, DeposiTech shall have the right to remove the equipment from Sierra's facility with no further obligation to Sierra. . . ."

DeposiTech also agreed to provide assistance to Sierra in setting up and developing the Prototype at a rate of $150 per hour. If Sierra decided to use the developed equipment to process printed circuit boards or similar items, a separate contract would be executed by Sierra and DeposiTech at that time.

As later described by Tarzwell at trial, Sierra's strategy was to get the Prototype up and running, and spend whatever money was necessary to make its own pre-production machine. He believed the PlasmaPlate technology was "very, very forward and very sound" and fit Sierra's needs "very, very well." Sierra budgeted about $550,000 to develop the Prototype and get it ready to use on actual customer printed circuit boards. That budget included costs and expenses for direct labor, new equipment, and other out-of-pocket expenses. Those budgeted costs did not include overhead or other indirect costs incurred in developing the Prototype. Sierra estimated that it would invest a total of $1.5 to $1.7 million to develop a production-ready model of the PlasmaPlate. The likelihood that it would invest that amount was "very good." Sierra spent about $40,000 to prepare its facility in anticipation of receiving the Prototype. Tarzwell spent about 400 hours researching and planning the project. Regardless of whether the PlasmaPlate

5

would ultimately realize its full potential, Sierra was committed to putting its money at risk to find out whether it would. However, Sierra never told DeposiTech exactly how much money it was willing to spend to develop the Prototype.

On March 21, 2008, the day after DeposiTech executed the Sierra Agreement, Drs. Daryl and John Doane of DeposiTech traveled to San Diego to personally oversee the removal of the Prototype from storage. A Bekins warehouse employee led them to the storage trailer, inside which they found the Prototype disassembled and crushed. The Prototype had been damaged in the 2004 move. However, pursuant to Bekins's policy, it did not inform DeposiTech of the damage to the Prototype until DeposiTech took delivery of it out of storage. Within one week, DeposiTech submitted a claim to Bekins with two repair estimates, one for $125,000 and another for $99,300. Bekins inspected the damage to the Prototype and then offered DeposiTech $2,400 to settle its claim, based on a provision in the Contract that purportedly limited its liability to $0.60 per pound. Although the parties were unable to resolve their dispute regarding the repair costs, Bekins eventually released the Prototype to DeposiTech in September 2008 and it was then transported to Sierra's facility in Sunnyvale. On examining the damaged Prototype, Sierra lost interest in developing it because of its condition. Sierra therefore cancelled the Sierra Agreement with DeposiTech. Thereafter, DeposiTech was unsuccessful in finding another investment or development partner.

DeposiTech filed the instant action against Bekins alleging, in its operative second amended complaint, causes of action for breach of contract, negligence, and fraud. In its fraud cause of action, it alleged Bekins intentionally did not disclose the Prototype had

6

been moved and damaged in the course of that move and falsely represented that the Prototype had been safely relocated to the Poway storage facility and would continue to be secured in a safe, climate-controlled environment. Relying on those concealments and misrepresentations, DeposiTech paid monthly storage fees to Bekins believing the Prototype was undamaged and would be available for use when a suitable development partner was found. DeposiTech allegedly sustained damages because of Bekins's fraud, including the cost to repair the Prototype and the loss of a business opportunity to further develop the Prototype. DeposiTech also sought punitive damages, alleging Bekins "acted with a [conscious] disregard of [DeposiTech's] rights, acted with malice, oppression, or fraud, and/or ratified the wrongful and fraudulent conduct alleged above."

Following trial, the jury returned a special verdict finding in favor of DeposiTech on all three causes of action. On the breach of contract claim, the jury awarded DeposiTech $3,300 for "other damage" (apparently for storage fees paid after the Prototype was damaged). On the negligence claim, the jury awarded it $115,000 for property damage (apparently for the cost of repairing the Prototype). On the fraud claim, the jury awarded it $550,000 for loss of business opportunity and $5,000 for "incidental/other" damage. The total amount of compensatory damages awarded DeposiTech was $673,300. The jury also found DeposiTech proved by clear and convincing evidence that Bekins engaged in conduct with malice, oppression, or fraud. Following further proceedings on punitive damages, the jury returned a second special verdict awarding DeposiTech $640,151.60 in punitive damages.

7

Bekins filed motions for new trial and judgment notwithstanding the verdict. DepositiTech filed a motion for attorney fees as the prevailing party. The trial court denied the motions. The court entered judgment for DepositiTech in accordance with the jury's special verdicts and awarded it a total of $1,313,451.60 in compensatory and punitive damages and $20,166.40 in costs. Bekins timely filed a notice of appeal challenging the judgment and order denying its motion for judgment notwithstanding the verdict. DepositiTech timely filed a notice of cross-appeal challenging the order denying its motion for attorney fees.

## DISCUSSION

### BEKINS'S APPEAL

### I

### Evidence and Jury Instruction on Lost Business Opportunity

Bekins contends the trial court erred by allowing DepositiTech to present evidence, and instructing the jury, on the loss of a business opportunity as compensatory damages for Bekins's fraud in the circumstances of this case. Bekins argues the only business opportunity that DepositiTech lost was the opportunity to earn net profits from a completed PlasmaPlate machine, and DepositiTech did not produce evidence of any lost net profits.

### A

"Parties have the 'right to have the jury instructed as to the law applicable to all their theories of the case . . . supported by the pleadings and the evidence, whether or not that evidence was considered persuasive by the trial court.' [Citation.] 'A reviewing

8

court must review the evidence most favorable to the contention that the requested instruction is applicable since the parties are entitled to an instruction thereon if the evidence so viewed could establish the elements of the theory presented.  [Citation.]' " (*Maxwell v. Powers* (1994) 22 Cal.App.4th 1596, 1607.)

Regarding the appropriate measure of damages and instructions, "[t]he trial court's choice among several legally permissible measures of damages, under the specific circumstances of the case, is a matter of discretion.  [Citation.]  However, whether a certain measure of damages is permissible given the legal right the defendant has [breached] is a matter of law, subject to de novo review." (*New West Charter Middle School v. Los Angeles Unified School Dist.* (2010) 187 Cal.App.4th 831, 843 (*New West*).)  Section 3333 provides the general standard for damages in tort cases:

> "For the breach of an obligation not arising from contract, the measure of damages, except where otherwise expressly provided by this code, is the amount which will *compensate for all the detriment* proximately caused thereby, whether it could have been anticipated or not." (Italics added.)

"Tort damages are awarded to fully compensate the victim for all the injury suffered. [Citation.]  There is no fixed rule for the measure of tort damages under . . . section 3333. The measure that most appropriately compensates the injured party for the loss sustained should be adopted." (*Santa Barbara Pistachio Ranch v. Chowchilla Water Dist.* (2001) 88 Cal.App.4th 439, 446-447 (*SBPR*).)  In the context of fraud claims, section 1709 provides: "One who willfully deceives another with intent to induce him to alter his position to his injury or [risk] is liable for any damage which he thereby suffers."  Section 3523 provides: "For every wrong there is a remedy."  Importantly for this case, section

9

1431.2, subdivision (b)(1), defines "economic damages" for purposes of personal injury and property damage cases (e.g., § 1709 fraud cases) as "objectively verifiable monetary losses including . . . loss of earnings, . . . costs of repair or replacement, . . . and *loss of business . . . opportunities*." (Italics added.)

B

Bekins filed a motion in limine to exclude all evidence on and references to speculative damage claims. Bekins argued that because DeposiTech's plasma technology for depositing material on printed circuit boards was not established or shown to be commercially viable, any claims by DeposiTech that it lost future profits or business opportunities were purely speculative and too uncertain to support compensation for any fraud Bekins committed. It requested the trial court exclude any evidence offered by DeposiTech on lost business opportunities or lost profits.

DeposiTech opposed that motion, arguing that because of Bekins's wrongful actions it "lost a golden opportunity it had secured with" Sierra to develop the Prototype and sought recovery not only for damage to the Prototype but also consequential damages for the loss of the business opportunity with Sierra.

The trial court implicitly granted the motion in part and denied it in part, stating:

> "[DeposiTech] cannot argue that well, if this machine were working we could have set this business up and we could be making $20,000,000 a year. You can't argue that. However, [DeposiTech] will be allowed to argue the fact that [it] had a business deal set up with this other company [i.e., Sierra] that [it was] going to provide X amount of dollars. [Sierra was] going to work it up. And the fact that [Bekins] damaged it, [DeposiTech] lost that agreement, and that is admissible as to what [it] lost. But as far as money that you would

10

have made 10 years from now because this thing was so great, it saved the world, you can't argue that, okay."

The court summarized DeposiTech's theory of lost business opportunity damages, stating: "[DeposiTech] had a deal, [Bekins] broke the machine, and Sierra said adios." Regarding DeposiTech's proffered evidence on its lost business opportunity, the court stated: "Sierra is going to come in here and say here is the deal we have with [DeposiTech], here is what we were willing to do, here is what we were willing to invest. Did you do it? No, because the machine was broken, we didn't do it, we walked. [DeposiTech is] entitled to put that before the jury, because . . . [¶] . . . [¶] . . . [Bekins] lost that deal for [it]." The court ruled that theory of lost business opportunity damages was not speculative. The court denied Bekins's motion to exclude DeposiTech's evidence on the loss of the business opportunity with Sierra.

The court instructed with a modified version of CACI No. 3900, stating: "If you decide that [DeposiTech] has proved [its] claim against [Bekins], you also must decide how much money will reasonably compensate [DeposiTech] for the harm. This compensation is called 'damages.' The amount of damages must include an award for each item of harm that was caused by [Bekins's] wrongful conduct, even if the particular harm could not have been anticipated. [DeposiTech] does not have to prove the exact amount of damages that will provide reasonable compensation for the harm. However, you must not speculate or guess in awarding damages." In addition to instructing the jury generally on tort damages with CACI No. 3900, the trial court specifically instructed on the lost business opportunity theory of damages, stating:

11

"If you find any of the defendants liable to plaintiff DepositTech, you may award DepositTech the value of any lost business opportunity you find it suffered because of that defendant's wrongful conduct."

The jury awarded DepositTech $550,000 in damages for its lost business opportunity that resulted from Bekins's fraud.

C

The crux of Bekins's contention appears to be that under applicable law DepositTech could recover damages caused by Bekins's fraud only to the extent it proved it lost net profits and *not* based on any alleged lost business opportunity. In support of its argument, Bekins cites *Electronic Funds Solutions, LLC v. Murphy* (2005) 134 Cal.App.4th 1161 (*EFS*), which involved a default judgment entered for the plaintiffs in the amount of $24,040,272 as a sanction for the defendants' discovery violations. (*Id*. at pp. 1166-1167, 1172.) *EFS* held that because the complaint sought damages "in an amount in excess of $50,000," Code of Civil Procedure section 580 limited the plaintiffs' recoverable compensatory damages in a default judgment to only $50,000. (*EFS,* at pp. 1173-1174.) *EFS* then concluded the trial court erred by awarding the plaintiffs $8,040,272.19 in compensatory damages based on the plaintiffs' expert witness's estimation of the market value of the defendants' unestablished business, rather than the lost profits the plaintiffs suffered. (*Id*. at pp. 1179-1180.) In that context, *EFS* generally stated: "Damage awards in injury to business cases are based on net profits. (See, e.g., *Kuffel v. Seaside Oil Co.* (1970) 11 Cal.App.3d 354, 366 . . . ['It is fundamental that in awarding damages for the loss of profits, net profits, not gross profits, are the proper measure of recovery'].)" (*EFS*, at p. 1180.) The court reversed the default judgment and

12

remanded the matter for a new damages hearing to determine the amount of the plaintiffs' lost profits, if any, limited to $50,000 (and the amount of any punitive damages) *or* for the plaintiffs to amend their complaint to allege an increased amount of compensatory damages (which amendment would reopen the defendants' default). (*Id*. at p. 1185.)

We conclude *EFS* does *not* provide support for Bekins's assertion that a business plaintiff in a fraud or other tort case can recover only lost net profits and no other forms of compensatory damages (e.g., lost business opportunities). First, *EFS*'s purported net profits limitation on damages must be limited to the default judgment circumstances in that case. Second, the case *EFS* cites as support for its purported compensatory damages limitation for businesses (i.e., *Kuffel v. Seaside Oil Co.*, *supra*, 11 Cal.App.3d 354) is inapposite to *EFS* and its quoted language does not support its broadly stated "rule." In *EFS*, the court quoted the following language from *Kuffel*: "It is fundamental that in awarding damages for the loss of profits, net profits, not gross profits, are the proper measure of recovery [citations]." (*Kuffel*, *supra*, at p. 366.) That language merely states the unremarkable proposition that when a plaintiff seeks lost profits, it can recover only lost *net* profits and not lost *gross* profits. It does *not* provide *any* support for *EFS*'s broad assertion that "[d]amage awards in injury to business cases are based on net profits." (*EFS*, *supra*, 134 Cal.App.4th at p. 1180.) We believe what the *EFS* court may have intended to convey is that when a business plaintiff seeks damages based on lost earnings, it is the loss of its net profits and not its gross profits that generally is the appropriate measure of damages. The language Bekins quotes from *EFS* does not support its broad assertion that a business plaintiff like DeposiTech can only recover

13

compensatory damages in the form of lost net profits and not in any other form (e.g., lost business opportunities). To the extent the *EFS* court intended to make such a broad general statement on compensatory damages, we disagree with that statement and are not persuaded to adopt it and apply it in this case.

As stated above, the general standard for tort damages is the "amount which will *compensate for all the detriment* proximately caused" by the tortious conduct. (§ 3333, italics added.) Furthermore, "[t]ort damages are awarded to *fully compensate* the victim for all the injury suffered. [Citation.] There is *no fixed rule for the measure of tort damages* under . . . section 3333. The measure that most appropriately compensates the injured party for the loss sustained should be adopted." (*SBPR*, *supra*, 88 Cal.App.4th at pp. 446-447, italics added.) Section 1431.2, subdivision (b)(1), defines "economic damages" for fraud and other tort cases as those "objectively verifiable monetary losses including . . . *loss of business . . . opportunities*." (Italics added.) We believe these statutory and case authorities support a broader range of measures of damages for business plaintiffs than asserted by Bekins. Whether a particular measure of damages is permissible in a fraud case is a matter of law, which we decide de novo. (*New West*, *supra*, 187 Cal.App.4th at p. 843.) Because we do not comprehend any legitimate, much less persuasive, reason to limit a business plaintiff's damages in a fraud case to only lost net profits, we conclude, as a matter of law, that a plaintiff, such as DeposiTech, is not precluded from seeking compensatory damages other than lost net profits. There is no fixed rule for fraud or other tort damages under section 3333. (*SBPR*, at pp. 446-447.)

14

Tort damages generally should be awarded in an amount that will compensate the plaintiff *for all detriment* proximately caused by the defendant's fraud or other tortious conduct. (§ 3333.) Economic damages (e.g., compensatory damages) include the *loss of a business opportunity*. (§ 1431.2, subd. (b)(1).) A business plaintiff in a fraud case, such as DeposiTech, may seek damages for a lost business opportunity as part of the compensatory damages it allegedly suffered. Furthermore, assuming DeposiTech provided substantial evidence of a lost business opportunity, we conclude the trial court properly allowed DeposiTech to present evidence, and instructed, on the loss of a business opportunity as damages for Bekins's fraud. Bekins has not carried its burden on appeal to show the trial court abused its discretion by allowing DeposiTech to seek compensatory damages based on that particular measure of damages. (*New West*, *supra*, 187 Cal.App.4th at p. 843.) We address below Bekins's argument that DeposiTech sought damages consisting only of Sierra's "overhead costs" rather than the value of its (DeposiTech's) lost business opportunity. None of the cases cited by Bekins are apposite to this case or otherwise persuade us to reach a contrary conclusion.

II

*Substantial Evidence of Lost Business Opportunity Damages*

Bekins contends the evidence is insufficient to support the jury's award to DeposiTech of $550,000 in damages for its loss of the business opportunity with Sierra.

A

On appeal, when the appellant contends there is insufficient evidence to support the jury's verdict, we apply the substantial evidence standard of review. (*Wilson v.*

15

*County of Orange* (2009) 169 Cal.App.4th 1185, 1188.) The substantial evidence standard of review involves two steps. "First, one must resolve all explicit conflicts in the evidence in favor of the respondent and presume in favor of the judgment all *reasonable* inferences. [Citation.] Second, one must determine whether the evidence thus marshaled is substantial. While it is commonly stated that our 'power' begins and ends with a determination that there is substantial evidence [citation], this does not mean we must blindly seize any evidence in support of the respondent in order to affirm the judgment. . . . [Citation.] '[I]f the word "substantial" [is to mean] anything at all, it clearly implies that such evidence must be of ponderable legal significance. Obviously the word cannot be deemed synonymous with "any" evidence. It must be reasonable . . . , credible, and of solid value . . . .' [Citation.] The ultimate determination is whether a *reasonable* trier of fact could have found for the respondent based on the *whole* record." (*Kuhn v. Department of General Services* (1994) 22 Cal.App.4th 1627, 1632-1633, fns. omitted.) "[T]he power of an appellate court *begins* and *ends* with the determination as to whether, *on the entire record*, there is substantial evidence, contradicted or uncontradicted, which will support the determination, and when two or more inferences can reasonably be deduced from the facts, a reviewing court is without power to substitute its deductions for those of the trial court. *If such substantial evidence be found, it is of no consequence that the trial court believing other evidence, or drawing other reasonable inferences, might have reached a contrary conclusion.*" (*Bowers v. Bernards* (1984) 150 Cal.App.3d 870, 873-874.)

16

B

Bekins asserts the evidence is insufficient to support the jury's finding that DeposiTech suffered $550,000 in damages for the lost business opportunity with Sierra. It argues there was no evidence Sierra was going to pay that amount to DeposiTech. However, Bekins does not persuade us the loss of a business opportunity can only be the direct loss of money and not, as in this case, the monetary value of some other benefit of a contract or other business opportunity. In this case, DeposiTech presented evidence that under the Sierra Agreement it would receive the benefit of a completed and/or further developed Prototype. Sierra agreed to "spend significant effort in developing [the Prototype] at its own expense." Although Sierra did not inform DeposiTech exactly how much it intended to spend on developing the Prototype, Tarzwell testified that Sierra budgeted about $550,000 to develop the Prototype and prepare it to use on actual customer printed circuit boards. That budget included costs and expenses for direct labor, new equipment, and other out-of-pocket expenses. Those budgeted costs did not include overhead or other indirect costs incurred in developing the Prototype. Based on that evidence, we conclude the jury could reasonably infer that when Bekins's fraud caused DeposiTech to lose the business opportunity under the Sierra Agreement, it lost the opportunity to obtain a completed and/or further developed Prototype at *Sierra's*, and not its, cost. Because Sierra had budgeted $550,000 in actual out-of-pocket costs (i.e., not overhead costs) to develop the Prototype, the jury could reasonably infer the monetary value of the improvements made by Sierra to the Prototype was $550,000. There is substantial evidence to support the jury's finding that the loss of DeposiTech's

17

business opportunity to obtain an improved Prototype at no cost to itself was equal to a loss of $550,000 caused by Bekins's fraud.

To the extent Bekins argues Sierra never told DepositTech it would spend that amount and the Sierra Agreement did not commit Sierra to take specific actions to develop the Prototype, Bekins misconstrues and/or misapplies the substantial evidence standard of review. It is not the function of an appellate court to reweigh the evidence and/or make inferences different from those made by the jury. Likewise, to the extent Bekins argues Sierra's budget of $550,000 to develop the Prototype included only "overhead costs" and not actual out-of-pocket costs of development, it again misconstrues and/or misapplies the substantial evidence standard of review. The record shows Sierra's $550,000 budget included costs and expenses for direct labor, new equipment, and other out-of-pocket expenses. Furthermore, Tarzwell testified those budgeted costs did *not* include *overhead* or other indirect costs incurred in developing the Prototype. Applying the substantial evidence standard of review, we conclude there is substantial evidence to support the jury's implied finding that the $550,000 amount Sierra planned to spend on developing the Prototype did *not* include any overhead costs.

We further note that Bekins did not present below, and has not presented on appeal, any expert testimony or case authority showing Sierra's $550,000 budget must be considered "overhead costs" as a matter of law and therefore cannot provide support for a jury's determination of a plaintiff's damages for a lost business opportunity. *Guntert v. City of Stockton* (1976) 55 Cal.App.3d 131, 148-149, cited by Bekins, is inapposite to this case and does not persuade us to reach a contrary result.

18

Furthermore, to the extent Bekins argues there is insufficient evidence to support $550,000 in damages for DeposiTech's lost business opportunity because it did not present evidence that it lost any net profits, Bekins conflates the net profits measure of damages with the lost business opportunity measure of damages. DeposiTech's failure to present evidence of lost net profits did not preclude it from presenting evidence of damages based on its lost business opportunity to obtain an improved Prototype at no cost to itself (i.e., at Sierra's cost). We are not persuaded by Bekins's argument that the opportunity to obtain an improved Prototype could have no value to DeposiTech except for any future net profits it would have earned from a completed Prototype.

Finally, Bekins again misconstrues and/or misapplies the substantial evidence standard of review when it argues that the jury's $115,000 award for the cost of repairing the Prototype was sufficient to make DeposiTech whole. Rather, the jury could reasonably infer that mere repair of the Prototype would not make DeposiTech whole because it also lost the business opportunity to have Sierra give it an improved and completed Prototype at no cost to itself. Accordingly, Bekins has not carried its burden on appeal to show there is insufficient evidence to support the jury's award of $550,000 in damages for DeposiTech's lost business opportunity. Because we conclude DeposiTech properly presented evidence on, and substantial evidence supports the jury's award of, damages for its lost business opportunity, we do not address Bekins's alternative argument that there also was insufficient evidence to support the $550,000 award based on a lost asset value theory.

19

## III

### *Punitive Damages*

Bekins contends that because the jury's compensatory damages award must be reduced, its punitive damages award must likewise be reduced or at least retried. However, that argument is conditioned on a determination that the jury's compensatory damages award must be reduced. Because that prerequisite has not been met, we do not address the merits of Bekins's challenge to the jury's award of punitive damages.

### *DEPOSITECH'S CROSS-APPEAL*

## IV

DeposiTech cross-appeals, challenging the trial court's order denying its motion for an award of attorney fees under section 1717 as the prevailing party in this action.

### A

After the jury returned its special verdicts in DeposiTech's favor, DeposiTech filed a motion for an award of attorney fees as the prevailing party. It argued that pursuant to an attorney fees provision in the Contract, it should be awarded attorney fees as the prevailing party under section 1717. DeposiTech cited the following provision of the Contract (Provision 1) as support for its motion:

> "1. **OWNERSHIP OF GOODS**: Depositor [i.e., DeposiTech] has represented to the Company [i.e., Bekins, as successor to Cole] that the Depositor has the lawful possession of and legal right and authority to store all of the property herein described, in accordance with the provisions, limitations, terms and conditions herein set forth; and if there be any litigation concerning the property, the Depositor agrees to pay all attorney's fees, which this Company may reasonably incur or become liable to pay in connection therewith.

20

> This Company shall have a lien on said property for all storage and
> other Charges and for such costs and expenses."

DeposiTech argued its action against Bekins was an action "on a contract" within the meaning of section 1717. It further argued its attorney fees should not be apportioned between its contract and noncontract causes of action because its causes of action all arose out of a common set of facts.

Bekins opposed the motion for attorney fees, contending there was no contractual provision that supported an award of attorney fees under section 1717. It argued the attorney fee provision in the Contract DeposiTech cited in support of its motion was a unilateral indemnification provision and *not* a section 1717 provision for attorney fees awards to a party that prevails in an action on the contract.

Following arguments of counsel, the trial court concluded Provision 1 of the Contract was an indemnification provision and therefore did not support a section 1717 attorney fee award. Reading the entire provision as a whole, the court concluded "this is an indemnification clause." It stated: "[Provision 1] does not, in any way, suggest litigation between the parties. It suggests litigation concerning the ownership of the property." Citing *Campbell v. Scripps Bank* (2000) 78 Cal.App.4th 1328 (*Campbell*), the court concluded the indemnification clause set forth in Provision 1 did not provide for an award of attorney fees in the circumstances of this case.

21

B

"[A]ttorney fees are not available to a prevailing party unless provided for by statute or contract." (*Otis Elevator Co. v. Toda Construction* (1994) 27 Cal.App.4th 559, 564.) Section 1717 provides:

> "(a) In any action on a contract, *where the contract specifically provides that attorney's fees and costs, which are incurred to enforce that contract, shall be awarded* either to one of the parties or to the prevailing party, then the party who is determined to be the party prevailing on the contract, whether he or she is the party specified in the contract or not, shall be entitled to reasonable attorney's fees in addition to other costs." (Italics added.)

"Where a contract provides for attorney fees in an action to enforce the contract, the attorney fees provision is made applicable to the entire contract by operation of . . . section 1717." (*Myers Building Industries, Ltd. v. Interface Technology, Inc.* (1993) 13 Cal.App.4th 949, 968 (*Myers*).) However, "[a] provision including attorney fees as an item of loss in an indemnity clause is not a provision for attorney fees in an action to enforce the contract." (*Id.* at p. 971.) "Under California law, an '[i]ndemnity is a contract by which one engages to save another from a legal consequence of the conduct of one of the parties or of some other person.' [Citation.] 'An indemnity against claims, or demands, or liability, expressly, or in other equivalent terms, embraces the costs of defense against such claims, demands, or liability incurred in good faith, and in the exercise of a reasonable discretion . . . .' [Citation.] . . . [¶] An indemnity agreement is to be interpreted according to the language and contents of the contract as well as the intention of the parties as indicated by the contract. [Citation.] The extent of the duty to

22

indemnify is determined from the contract. [Citation.] . . . [¶] . . . Indemnification agreements ordinarily relate to third party claims." (*Id*. at pp. 968-969.)

" ' " 'An order granting or denying an award of attorney fees is generally reviewed under an abuse of discretion standard of review; however, the "determination of whether the criteria for an award of attorney fees and costs have been met is a question of law." [Citation.] An issue of law concerning entitlement to attorney fees is reviewed de novo.' " ' " (*Carpenter & Zuckerman, LLP v. Cohen* (2011) 195 Cal.App.4th 373, 378.) Likewise, we apply de novo review and exercise our independent judgment in interpreting a contract if there is no disputed extrinsic evidence on its interpretation. (*Campbell*, *supra*, 78 Cal.App.4th at p. 1336.)

C

DeposiTech asserts the trial court erred by denying its motion for an award of attorney fees because Provision 1 of the Contract provides for an award of attorney fees in an action to enforce the Contract and is not, as the trial court found, merely an indemnification provision. However, reading Provision 1 and the other provisions of the Contract as a whole and in context and considering the ordinary meaning of the words used, we conclude Provision 1 is, as the trial court found, an indemnification provision. Furthermore, we conclude Provision 1 does not "specifically provide[]" for an award of attorney fees "incurred to enforce that contract [i.e., the Contract].*"* (§ 1717, subd. (a).) Therefore, the trial court correctly denied DeposiTech's motion for attorney fees.

We begin our analysis by reviewing pertinent rules for interpretation of contracts. "When a contract is reduced to writing, the intention of the parties is to be ascertained

23

from the writing alone, if possible; subject, however, to the other provisions of this Title." (§ 1639.)  "The language of a contract is to govern its interpretation, if the language is clear and explicit, and does not involve an absurdity."  (§ 1638.)  "The whole of a contract is to be taken together, so as to give effect to every part, if reasonably practicable, each clause helping to interpret the other."  (§ 1641.)  "If the terms of a promise are in any respect ambiguous or uncertain, it must be interpreted in the sense in which the promisor believed, at the time of making it, that the promissee understood it." (§ 1649.)  A contractual provision "is ambiguous if it is capable of more than one reasonable construction.  [Citation.]  However, we will not strain the [contract] language to create an ambiguity.  [Citation.]  Moreover, we will not label a provision ambiguous simply upon isolating phrases and considering them in the abstract.  Rather, we must construe the provision in relation to the whole of the instrument, with each clause giving meaning to the other."  (*Continental Ins. Co. v. Superior Court* (1995) 37 Cal.App.4th 69, 82.)  Finally, if after applying all other rules of interpretation a contract's language is determined to be ambiguous, then "the language of a contract should be interpreted most strongly against the party who caused the uncertainty to exist."  (§ 1654.)

On close examination of the language of Provision 1 and its context in the entire Contract, we conclude, as a matter of law, that Provision 1 is an indemnification provision.  The title of Provision 1 is "OWNERSHIP OF GOODS," indicating that its subject matter is the ownership of the stored property.  Provision 1 consists of one compound sentence.  The main purpose of Provision 1 is set forth at the outset of that sentence with DeposiTech representing to Bekins that it has "the lawful possession of and

24

legal right and authority to store" the Prototype and other property listed in the Contract. Given the context of the Contract, that representation is made as of the time the Contract is executed and/or when the property is initially transferred to and stored at Bekins's facility (e.g., on or about October 5, 1999). Related to that representation, DeposiTech agrees to pay all attorney fees that Bekins may reasonably incur in connection with "any litigation regarding the property." Reading Provision 1 as a whole and in the context of the Contract, the reasonable construction of "any litigation regarding the property" is any litigation regarding the property (e.g., the Prototype) against Bekins challenging DeposiTech's possession of and right to store that property as of October 5, 1999, when DeposiTech made the representation to Bekins and initially stored the property at its facility. To the extent a third party would thereafter file an action against Bekins challenging DeposiTech's possession of or right to store that property as of October 5, 1999, Provision 1 provided, in effect, that DeposiTech agreed to indemnify Bekins for all reasonable attorney fees incurred in defending that action. Likewise, to the extent Provision 1 could reasonably be construed as a "continuing" representation (i.e., that DeposiTech represented it had possession of and the right to store the Prototype and other listed property during the entire term of the Contract), Provision 1 provided that DeposiTech would indemnify Bekins for attorney fees incurred in third party actions against it challenging DeposiTech's right to the property. Provision 1 is, as Bekins argues and the trial court found, an indemnification provision.

Provision 1 cannot reasonably be construed as providing for attorney fees in actions between Bekins and DeposiTech regarding DeposiTech's possession of or legal

25

right to the stored property. By focusing only on selected language in Provision 1 (i.e., "all litigation regarding the property"), it could be argued such litigation could include future litigation not only between Bekins and third parties, but also litigation between Bekins and DeposiTech regarding the property. However, when that selected language is considered as a whole with all of Provision 1 and the other provisions of the Contract, we conclude such an interpretation is unreasonable. Provision 1 cannot be reasonably interpreted as applying to litigation between Bekins and DeposiTech (e.g., if DeposiTech were to file an action challenging Bekins's right to enforce its warehouseman's lien on the property for nonpayment of storage fees pursuant to Provision 11 of the Contract). Furthermore, as discussed above, Provision 1 sets forth DeposiTech's representation regarding its lawful possession of and legal right to store the property as of October 5, 1999. There presumably could not be any litigation between Bekins and DeposiTech regarding DeposiTech's lawful possession and right to store the property as of that initial storage date. It is inconceivable that Bekins would file any action against DeposiTech regarding its possession of and right to store the property as of that date unless a third party claimed a legal right to that property.

We further note the Contract does not contain any express provision for awards of attorney fees to either party in actions on the Contract. Provision 12 of the Contract provides for arbitration of "[a]ny dispute or claim arising out of or for the breach of this agreement or in connection with the property stored hereunder, whether founded in tort or

26

contract."[2]  That provision expressly provides for the equal sharing by the parties of the cost of arbitration.  However, it does not include any provision regarding the award or sharing of attorney fees incurred by one or both parties in arbitration (or in litigation to obtain a court order enforcing an arbitration award or otherwise).  The absence of any express provision awarding attorney fees to a party that prevails in any arbitration (or court action) to enforce the Contract, or otherwise arising out of or relating to the Contract, supports our conclusion that the parties did not intend to award attorney fees to a prevailing party in a dispute between them.  Provision 12 supports our conclusion that the only reasonable construction of Provision 1 is that its attorney fee language constitutes an indemnification provision (i.e., DepositTech indemnifies Bekins for attorney fees incurred in any litigation against it filed by third parties regarding the property).  Because there is only one reasonable construction of that provision, it is not ambiguous and therefore the default rule for construction against its drafter (i.e., § 1654) does not apply.

---

[2]	Provision 12 of the Contract provides: "TIME FOR FILING CLAIMS-ARBITRATION: . . . [¶] (b)  Any dispute or claim arising out of or for the breach of this agreement or in connection with the property stored hereunder, whether founded in tort or contract, shall be settled by arbitration under the Arbitration Law of this state and under the rules of the American Arbitration Association, provided, however, that upon any such arbitration, the arbitrator may not vary, modify or disregard the provisions contained herein, including those respecting the declared or agreed valuation of the goods and the limitation of liability of the Company.  The award may be entered as a judgment of a court of record in the county where the award is made.  The Depositor and the Company shall share equally the cost of arbitration.  Court costs shall be borne by the losing party."

27

"A provision including attorney fees as an item of loss in an indemnity clause is not a provision for attorney fees in an action to enforce the contract." (*Myers*, *supra*, 13 Cal.App.4th at p. 971.) Alternatively stated, "the inclusion of attorney fees as an item of loss in a third party claim-indemnity provision does not constitute a provision for the award of attorney fees in an action on the contract which is required to trigger section 1717." (*Carr Business Enterprises, Inc. v. City of Chowchilla* (2008) 166 Cal.App.4th 14, 20.) Because Provision 1 of the Contract does not "specifically provide[] that attorney's fees and costs, which are incurred to enforce that contract, shall be awarded either to one of the parties or to the prevailing party" as required for application of section 1717, there is no statutory or contractual basis on which to award DeposiTech attorney fees incurred in the instant action. (§ 1717, subd. (a); cf. *Carr Business Enterprises*, at pp. 20-23; *Campbell*, *supra*, 78 Cal.App.4th at pp. 1335-1338; *Building Maintenance Service Co. v. AIL Systems, Inc.* (1997) 55 Cal.App.4th 1014, 1029-1032; *Otis Elevator Co. v. Toda Construction*, *supra*, 27 Cal.App.4th at pp. 564-566; *Myers,* at pp. 973-975.) *Baldwin Builders v. Coast Plastering Corp.* (2005) 125 Cal.App.4th 1339, cited by DeposiTech, is factually inapposite to this case and does not persuade us to reach a contrary conclusion. In that case, the indemnity provision expressly provided the indemnitor " 'shall pay all costs, including attorney's fees, incurred in enforcing this indemnity agreement [i.e., in an action to enforce the contract].' " (*Id.* at p. 1342.) The trial court correctly denied DeposiTech's section 1717 motion for an award of attorney fees incurred in this action. In resolving this contention on this ground, we need not address the merits of the parties' alternative arguments regarding the attorney fees issue.

28

## DISPOSITION

The judgment and order denying the motion for attorney fees are affirmed.  Each party shall bear its own costs on appeal.


McDONALD, J.

WE CONCUR:


NARES, Acting P. J.


McINTYRE, J.